Paul A. Kampmeier, WSBA #31560
Kampmeier & Knutsen PLLC
705 Second Avenue, Suite 901
Seattle, Washington 98104
Telephone: (206) 858-6983
Email: paul@kampmeierknutsen.com

Emma A.O. Bruden, WSBA # 56280
Kampmeier & Knutsen PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
Tel: (503) 719-5641
Email: emma@kampmeierknutsen.com

*Attorneys for Plaintiff Communities for a Healthy Bay*

The Honorable Tiffany M. Cartwright

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

COMMUNITIES FOR A HEALTHY BAY, a Washington non-profit corporation,

Plaintiff,

v.

TYEE MARINA, LLC, a Washington Limited Liability Company; TYEE PROPERTIES, LLC, a Washington Limited Liability Company; and WILLIAM BRADBROOKE, an individual,

Defendants.

Case No. 3:23-cv-05432-TMC

STIPULATIONS AND CONSENT DECREE

## I.    STIPULATIONS.

In these Stipulations and the proposed Consent Decree below, the Parties refer to Tyee Marina, LLC, Tyee Properties, LLC, and Mr. William Bradbrooke, the Defendants in this case, as "Defendants" or "Tyee."

STIPULATIONS AND **[PROPOSED]** CONSENT DECREE - 1
W.D. Wash. Case. No. 3:23-cv-05432-TMC

Kampmeier & Knutsen PLLC
705 Second Avenue, Suite 901
Seattle, Washington 98104
(206) 858-6983

On August 25, 2022, Plaintiff Communities for a Healthy Bay (hereinafter "Communities") sent Defendants and Tyee Associates, Incorporated, a notice of intent to sue that alleged Defendants and Tyee Associates, Incorporated, are violating Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), at a marina located at or near 5618 Marine View Drive, Tacoma, Washington 98422, including in the surrounding waters, shores and beaches, and at any additional areas that Tyee uses (hereinafter "the Facility"), by discharging pollutants from point sources to Puget Sound and Commencement Bay without authorization of a National Pollutant Discharge Elimination System ("NPDES") permit (hereinafter "Notice Letter").

On May 11, 2023, Communities filed the Complaint in this action, alleging Defendants are in ongoing violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), for discharging pollutants from point sources at the Facility to Puget Sound and Commencement Bay without authorization of a NPDES permit. Plaintiff's Complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and an award of costs, including attorneys' and expert witness fees, for alleged violations of the CWA at the Facility.

Tyee Marina, LLC, Tyee Properties, LLC, and William Bradbrooke deny any fault, wrongdoing, or liability for the claims and violations alleged in Plaintiff's Notice Letter and Complaint.

Plaintiff and Defendants agree and stipulate that a new violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), occurs, and that a new Clean Water Act claim for unpermitted discharges accrues, on the date when an unauthorized discharge of pollutants from a point source occurs. Plaintiff and Defendants further agree and stipulate that Plaintiff must satisfy the requirements of the Clean Water Act, including the citizen suit provisions in 33 U.S.C. § 1365, and that Plaintiff must have Article III standing, in order to bring or maintain a Clean Water Act enforcement action for alleged violations of the Clean Water Act that occur at the Facility after

---

STIPULATIONS AND **[PROPOSED]** CONSENT DECREE - 2
W.D. Wash. Case. No. 3:23-cv-05432-TMC

Kampmeier & Knutsen PLLC
705 Second Avenue, Suite 901
Seattle, Washington 98104
(206) 858-6983

the termination date set forth in the Consent Decree below. Except as provided herein, including in Paragraph 14 below, Defendants expressly reserve the right to raise any defense and argument that may be available to them in any such litigation, and do not waive any pre-suit notice requirement established by law.

Plaintiff and Defendants (collectively the "Parties" and individually a "Party"), have agreed to settlement terms, which are stated and reflected in these Stipulations and proposed Consent Decree and the Exhibits hereto, and which the Parties intend to resolve this case.

The Parties intend to abide by and implement these Stipulations and the proposed Consent Decree in good faith; the Parties agree not to take steps to undermine these Stipulations and the proposed Consent Decree; and the Parties agree to resolve any concerns about compliance with these Stipulations and the proposed Consent Decree through the dispute resolution process in Paragraph 17 below.

Defendants represent and warrant that they are capable of satisfying all monetary obligations imposed by the Consent Decree below and that they intend to satisfy all such monetary obligations below by the deadlines imposed.

Plaintiff and Defendants agree that settlement of these matters is in the best interest of the Parties and the public, and that entry of the Consent Decree below without additional litigation is the most appropriate means of resolving this action.

Plaintiff and Defendants, by their authorized counsel and without trial, adjudication, or admission of any allegation, issue of fact, or issue of law pertaining to any Parties' claims or allegations, consent to entry of this Consent Decree.

These Stipulations and Consent Decree constitute the entire agreement between the Parties; there are no other or further agreements, either written or verbal.

---

STIPULATIONS AND **[PROPOSED]** CONSENT DECREE - 3
W.D. Wash. Case. No. 3:23-cv-05432-TMC

Kampmeier & Knutsen PLLC
705 Second Avenue, Suite 901
Seattle, Washington 98104
(206) 858-6983

1    Upon the signing of these Stipulations and Consent Decree by representatives of the Par-

2  ties, Plaintiff shall serve copies of it upon the Administrator of the U.S. Environmental Protec-

3  tion Agency and the U.S. Attorney General. To ensure compliance with Section 505(c)(3) of the

4
   CWA, 33 U.S.C. § 1365(c)(3), Plaintiff and Defendants will not ask the Court to enter this Con-
5
6  sent Decree prior to forty-five (45) days following receipt of it by the U.S. Attorney General and

7  the Administrator of the U.S. Environmental Protection Agency.

8    If for any reason the Court should decline to approve this proposed Consent Decree in the

9  form presented, then any Party may void the settlement embodied herein and Plaintiff may reo-

10 pen this case and resume litigation.

11   The undersigned representative for each Party certifies that he or she is fully authorized
12
   by the Party or Parties whom he or she represents to enter into the terms and conditions of these
13
14 Stipulations and proposed Consent Decree and to legally bind the Party or Parties and their suc-

15 cessors in interest to it.

16   SO STIPULATED AND AGREED this 14th day of November 2023.

17 **COMMUNITIES FOR A HEALTHY BAY**          **TYEE MARINA, LLC**

18
   By: _Melisa Malott_ on November 15,        By: _William Bradbrooke_
19     Melissa Malott, Executive Director  2023    William Bradbrooke

20 **TYEE PROPERTIES, LLC**                    **WILLIAM BRADBROOKE**

21

22 By: _William Bradbrooke_                    _William Bradbrooke_
23    William Bradbrooke

24              **II.    ORDER AND DECREE.**

25   THIS MATTER came before the Court on the foregoing Stipulations of the Parties and

26 the Parties' Joint Motion for Entry of Consent Decree. Having considered the stipulations, the

27 joint motion, and the terms and conditions below, the Court hereby ORDERS, ADJUDGES
28

---

STIPULATIONS AND [PROPOSED] CONSENT DECREE - 4          Kampmeier & Knutsen PLLC
W.D. Wash. Case. No. 3:23-cv-05432-TMC                  705 Second Avenue, Suite 901
                                                        Seattle, Washington 98104
                                                        (206) 858-6983

AND DECREES as follows:

1.      This Court has jurisdiction over the Parties and subject-matter of this action pursuant to section 505(a) of the CWA, 33 U.S.C. § 1365(a).

2.      **Effective Date and Termination Date.** This Consent Decree shall take effect on the date it is entered as an Order of the Court (the "Effective Date"). This Consent Decree shall terminate four years after the Effective Date.

3.      This Consent Decree shall inure to the benefit of, and be binding upon, the Parties and their successors, assigns, officials, agents, representatives, officers, directors, and employees. Changes in the organizational form or status of a Party shall have no effect on the binding nature of this Consent Decree or its applicability.

4.      Plaintiff and Defendants are subject to and shall abide by the terms and conditions of this Consent Decree.

5.      **Storage and Housekeeping Measures.**

a.   Except as provided in Paragraph 5.b. herein: (i) within thirty (30) days of the Effective Date, Defendants shall clean up and remove from the Facility all Loose Materials, as defined in Paragraph 5.c. herein, that are being stored or have been discarded outside at the Facility, including from the area that is west or northwest of the paved parking lot at the Facility, which area is labeled "West Storage Yard" in the diagram attached hereto as Exhibit A and is also labeled "storage" in the diagram attached hereto as Exhibit C, and including from all breakwaters and floats at the Facility; and (ii) thereafter, while this Consent Decree remains in effect, Defendants shall not dump, discard, or store any Loose Materials outside at the Facility, including in the area west or northwest of the paved parking lot at the Facility and including on any breakwater or vessel used as a breakwater at the Facility.

STIPULATIONS AND **[PROPOSED]** CONSENT DECREE - 5
W.D. Wash. Case. No. 3:23-cv-05432-TMC

Kampmeier & Knutsen PLLC
705 Second Avenue, Suite 901
Seattle, Washington 98104
(206) 858-6983

b.   Defendants may only store the following materials outside at the Facility: concrete floats in good repair; steel pilings; and building and construction materials that are designed and intended for outdoor use at the Facility, and that are in good condition (*e.g.*, where there is no unencapsulated or exposed polystyrene or Styrofoam). Defendants may store such materials uncovered. Defendants may store such materials in the area west or northwest of the paved parking lot at the Facility, and north of the unpaved path or road in that area, which area is labeled "West Storage Yard" in the diagram attached hereto as Exhibit A and is also labeled "storage" in the diagram attached hereto as Exhibit C, but Defendants shall not use that area for any other use and Defendants shall not use the area south of the unpaved road or path for any use whatsoever.

c.   As used herein, the term "Loose Materials" means garbage, refuse, unencapsulated polystyrene (including Styrofoam), scrap wood, scrap metal, gravel, rocks, dirt, broken pieces of cement, plastic that is not being used as perimeter fencing, discarded equipment, concrete floats that are not in good repair, building or construction materials that are not designed or intended for outdoor use at the Facility, or any other material that has been discarded or is stored in a manner that presents a reasonable likelihood the material may enter waters of the United States. The term "Loose Materials" does not include garbage or refuse that is temporarily and properly stored, e.g., in a covered garbage bin, or small scattered pieces of materials, including polystyrene, that were not stored or discarded and that are as a practical matter infeasible to pick up.

6.    **Accelerated Planned Improvements.**

a.   Tyee shall make a good faith effort to accelerate the July 1, 2033 timeline for completing the work required by Exhibit B, section 2(g) of the Aquatic Lands Lease No. 20-B11091 Plan of Operations, which is attached hereto as Exhibit B, or the timeline otherwise

STIPULATIONS AND **[PROPOSED]** CONSENT DECREE - 6
W.D. Wash. Case. No. 3:23-cv-05432-TMC

Kampmeier & Knutsen PLLC
705 Second Avenue, Suite 901
Seattle, Washington 98104
(206) 858-6983

approved by the Washington State Department of Natural Resources ("DNR"), and shall report to Communities on an annual basis what efforts it has made to accelerate the timelines for completing that work.

b.    Tyee shall make a good faith effort to accelerate the July 1, 2033 timeline for completing the work required by Exhibit B, section 2(h) of the Aquatic Lands Lease No. 20-B11091 Plan of Operations, which is attached as Exhibit B, or the timeline otherwise approved by DNR, and shall report to Communities on an annual basis what efforts it has made to accelerate the timelines for completing that work.

c.    Tyee shall accelerate the timeline for removing the roof on the northeast dock that is identified in red in Exhibit C to this Consent Decree, and Tyee shall complete roof removal by December 31, 2024, subject to Tyee's ability to obtain permit approval(s). Tyee shall make all good faith efforts to expeditiously secure any applicable permit approval(s). Tyee shall notify Communities in writing when it completes the work required by this Paragraph.

d.    Tyee shall complete the resurfacing of two floating structures, formerly known as the Northland and the Stormy Sea, by December 31, 2024, subject to Tyee's ability to obtain permit approval(s). Tyee shall make all good faith efforts to expeditiously secure any applicable permit approval(s). Tyee shall notify Communities in writing when it completes the work required by this Paragraph.

7.    **Replacing Breakwaters.** While this Consent Decree remains in force, when Tyee determines that breakwaters at the Facility have reached the end of their useful life, Tyee shall replace breakwaters at the Facility with structures that are suitable and legal replacements and that are not vessels or former vessels. Additionally, while this Consent Decree remains in force: (a) Tyee shall inspect all the breakwaters once a quarter; (b) Tyee shall not use unencapsulated

STIPULATIONS AND **[PROPOSED]** CONSENT DECREE - 7
W.D. Wash. Case. No. 3:23-cv-05432-TMC

Kampmeier & Knutsen PLLC
705 Second Avenue, Suite 901
Seattle, Washington 98104
(206) 858-6983

polystyrene on the surface of any breakwater for any purpose; (c) Tyee shall not add any unencapsulated polystyrene to any breakwater to keep any breakwater afloat; and (d) Tyee shall maintain the breakwaters to avoid the release of polystyrene into waters of the United States.

8.      **Replacing Floats.** Within thirty (30) days of the Effective Date, Tyee shall remove all concrete floats that are in use at the Facility that have exposed or unencapsulated polystyrene (including Styrofoam).

9.      **Inspections and Repairs.** While this Consent Decree is in effect, Tyee shall: (a) on a monthly basis, inspect all materials storage areas and all breakwaters and initiate any necessary steps to ensure compliance with Paragraph 5 of this Consent Decree, with such steps to be completed within a reasonable time after the inspection; (b) on a quarterly basis, inspect all breakwaters to identify and complete (subject to permits or authorizations as applicable) any repairs, maintenance, or painting that Tyee identifies as needing to be done; and (c) immediately after each inspection required by this Paragraph, record in an inspection log book the dates, times, findings, and actions taken at the Facility as a result of each inspection, which logbook Tyee shall make available to Communities during any visit by Communities to the Facility.

10.     **Public Involvement and Transparency.**

a.   For a period of four (4) years from the Effective Date, Tyee shall permit Communities and its volunteers reasonable access to Yokwala Beach, identified in Exhibit C, through the Marina's roadway for Communities to host beach clean ups. Communities shall provide Tyee with ten (10) business days' notice before any Yokwala Beach clean ups. Tyee may condition access on the signing of a reasonable waiver from the Communities representatives and/or volunteers attending. CHB is not authorized to sample media during these visits.

b.   While this Consent Decree remains in force, Tyee shall permit Communities to

STIPULATIONS AND **[PROPOSED]** CONSENT DECREE - 8
W.D. Wash. Case. No. 3:23-cv-05432-TMC

Kampmeier & Knutsen PLLC
705 Second Avenue, Suite 901
Seattle, Washington 98104
(206) 858-6983

make quarterly visits to the Facility with its consultants to inspect the Facility to ensure Defendants' compliance with this Consent Decree. Communities shall provide Tyee with ten (10) business days' notice before each quarterly visit. Tyee will designate a representative to provide a pedestrian tour of the entire Marina during each quarterly visit, though Tyee reserves the right to deny Communities access inside buildings or onto or within the breakwaters, provided Communities has sufficient views of and access to the breakwaters to confirm Tyee's compliance with Paragraph 5 of this Consent Decree. Such visits will occur and be completed during normal business hours, be limited to a reasonable number of Communities representatives (not to exceed five individuals), and be limited to a reasonable duration (not to exceed three hours). Upon arrival for each quarterly visit, Communities' representatives shall identify themselves at Tyee's office. Tyee may condition participation in each site visit on the signing of a reasonable waiver from the Communities representatives and/or volunteers attending. Communities is not authorized to sample media during these visits.

  c. While this Consent Decree is in effect, Tyee shall provide Communities with a formal response in writing within fourteen (14) days of Communities notifying Tyee of any water quality concerns Communities identifies at the Facility.

  11. **Supplemental Environmental Project.** In lieu of a penalty, within fourteen (14) days of the Effective Date, Defendant Tyee Marina, LLC shall pay EIGHT THOUSAND DOLLARS AND NO CENTS ($8,000.00) to the Rose Foundation for Communities and the Environment for one or more projects benefiting water quality and/or aquatic habitat in Puget Sound, as described in Exhibit D to this Consent Decree. Defendant Tyee Marina, LLC make the payment required by this Paragraph 11 by check made payable and mailed to the Rose Foundation for Communities and the Environment, 201 4th Street, Suite 102, Oakland, California 94607-4369. The payment shall bear the notation "Communities for a Healthy Bay/Tyee Marina Clean

STIPULATIONS AND **[PROPOSED]** CONSENT DECREE - 9
W.D. Wash. Case. No. 3:23-cv-05432-TMC

Kampmeier & Knutsen PLLC
705 Second Avenue, Suite 901
Seattle, Washington 98104
(206) 858-6983

1  Water Act Settlement."

2       12.     **Reimbursement of Plaintiff's Fees and Costs**. Within fourteen (14) days of the

3  Effective Date, Defendant Tyee Marina, LLC shall pay ONE HUNDRED EIGHTY-FIVE

4  THOUSAND DOLLARS AND NO CENTS ($185,000.00) to Kampmeier & Knutsen, PLLC,

5  Plaintiff's attorneys in this case, for costs and attorneys' fees incurred in representing Plaintiff in

6  this matter. Defendant Tyee Marina, LLC shall make the payment required by this Paragraph 12

7  by electronic funds transfer to the business checking bank account maintained by Kampmeier &

8  Knutsen PLLC, in Seattle, Washington. Within ten (10) days of the Effective Date of this Con-

9  sent Decree, Plaintiff shall, through counsel, provide to counsel for Defendants the information

10  necessary to make the electronic funds transfer required by this Paragraph. Before finalizing the

11  payment, Defendant Tyee Marina, LLC shall contact Kampmeier & Knutsen, PLLC, counsel for

12  Plaintiff, to confirm the bank account number and routing number of the account designated to

13  receive the payment. Defendant Tyee Marina, LLC shall not direct the payment required by this

14  Paragraph to any other bank account or recipient unless the Parties seek and the Court issues an

15  order modifying this Paragraph of this consent decree. Defendant Tyee Marina, LLC shall notify

16  Plaintiff in writing when it makes the payment required by this Paragraph 12.

17       13.     **Settlement and Release.** As of the Effective Date, Plaintiff releases Defendants,

18  Tyee Associates, Incorporated, and their members, owners, officials, agents, representatives, of-

19  ficers, directors, employees, successors, and assigns from all Clean Water Act claims for pollu-

20  tant discharges that occur at the Facility through the Termination Date. With respect to claims

21  released, enforcement of this Consent Decree is Plaintiff's exclusive remedy for any violation of

22  its terms.

23       14.     **Limitation on Settlement and Release.** Nothing in this Consent Decree, or the

24  Stipulations on which it is based, prevents or shall be construed to prevent Communities from

STIPULATIONS AND **[PROPOSED]** CONSENT DECREE - 10
W.D. Wash. Case. No. 3:23-cv-05432-TMC

Kampmeier & Knutsen PLLC
705 Second Avenue, Suite 901
Seattle, Washington 98104
(206) 858-6983

bringing Clean Water Act claims against Defendants or others for any discharge of pollutants or violation of the Clean Water Act that occurs at the Facility after the Termination Date. This Consent Decree preserves Communities' ability and right to enforce the Clean Water Act against Defendants and others for any unauthorized discharges of pollutants that occur at the Facility after the Termination Date. Except as provided herein, Defendants expressly reserve the right to raise any defense and argument that may be available to them in any such litigation, and do not waive any pre-suit notice requirement established by law.

15.     **Modifications.** This Consent Decree may be modified only upon a writing signed by representatives for all Parties and approved by the Court.

16.     **Terms Severable.** If any term, covenant, or condition of this Consent Decree is held to be invalid or unenforceable in any respect, such invalidity or unenforceability shall not affect any other provision included in this Consent Decree. This Consent Decree shall be construed as if such invalid or unenforceable provision had never been contained in this Consent Decree.

17.     This Court shall retain jurisdiction to oversee and ensure compliance with this Consent Decree. This Consent Decree is an agreed settlement and shall not, in the first instance, be enforceable through a proceeding for contempt of Court. Instead, while this Consent Decree remains in force, the Parties may reopen this case without filing fee to apply to the Court for any further order or relief that may be necessary regarding compliance with this Consent Decree or to resolve any dispute regarding this Consent Decree. Before applying to the Court under this Paragraph 17, the Parties must first seek to resolve the dispute themselves, as follows: the Party identifying or wishing to raise an issue or dispute must provide the other Party's counsel of record with written notice detailing the nature of the issue or dispute, the underlying facts, and the legal grounds for the alleged issue or dispute; within twenty (20) days of receipt of such notice, the

STIPULATIONS AND **[PROPOSED]** CONSENT DECREE - 11
W.D. Wash. Case. No. 3:23-cv-05432-TMC

Kampmeier & Knutsen PLLC
705 Second Avenue, Suite 901
Seattle, Washington 98104
(206) 858-6983

Parties shall meet and confer regarding the issue or dispute, and seek to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute or alleged breach; and if the Parties are unable to resolve the dispute at that meeting, either Party may seek relief from this Court.

18.     All notices and other communications regarding this Consent Decree shall be in writing and shall be fully given by mailing via first class mail, postage pre-paid; by delivering the same by hand; or by sending the same via e-mail to the following addresses, or to such other addresses as the Parties may designate by written notice, provided that communications that are mailed shall not be deemed to have been given until three business days after mailing:

<u>For Plaintiff Communities for a Healthy Bay</u>:

Melissa Malott, Executive Director
Communities for a Healthy Bay
535 Dock Street, Suite 213
Tacoma, Washington 98402
mmalott@healthybay.org

**With a copy to:**

Mr. Paul Kampmeier
Kampmeier & Knutsen, PLLC
705 Second Avenue, Suite 901
Seattle, Washington 98104
paul@kampmeierknutsen.com

<u>For Defendants Tyee Marina, LLC, Tyee Properties, LLC, and William Bradbrooke</u>:

Mr. William Bradbrooke
Tyee Marina
5618 Marine View Drive
Tacoma, Washington 98422

**With a copy to:**

Mr. Bradford Doll
doll@tmw-law.com

STIPULATIONS AND **[PROPOSED]** CONSENT DECREE - 12
W.D. Wash. Case. No. 3:23-cv-05432-TMC

Kampmeier & Knutsen PLLC
705 Second Avenue, Suite 901
Seattle, Washington 98104
(206) 858-6983

1

2

19.     The provisions in section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), re-

garding awards of costs of litigation (including reasonable attorney and expert witness fees) to

3

4

any prevailing or substantially prevailing Party, shall apply to any proceeding seeking to enforce

the terms and conditions of this Consent Decree.

5

6

IT IS SO ORDERED.

7

DATED this 5th day of January, 2024.

8

9

10

_____

11

Tiffany M. Cartwright
United States District Court Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATIONS AND **[PROPOSED]** CONSENT DECREE - 13
W.D. Wash. Case. No. 3:23-cv-05432-TMC

Kampmeier & Knutsen PLLC
705 Second Avenue, Suite 901
Seattle, Washington 98104
(206) 858-6983

# Exhibit A



Exhibit B

When recorded, return to:
Tyee Properties, LLC
5618 Marine View Drive
Tacoma, WA 98422



**WASHINGTON STATE DEPARTMENT OF**
**Natural Resources**
**Peter Goldmark - Commissioner of Public Lands**

## AQUATIC LANDS LEASE

**Lease No.  20-B11091**

Grantor:       Washington State Department of Natural Resources
Grantee(s):   TYEE PROPERTIES, LLC
Legal Description: Section 21 and 22, Township 21 North, Range 3 East, W.M.
Assessor's Property Tax Parcel or Account Number: 0321211044
Assessor's Property Tax Parcel or Account Number for Upland parcel used in conjunction with this lease:  Not Applicable

THIS LEASE is between the STATE OF WASHINGTON, acting through the Department of Natural Resources ("State"), and TYEE PROPERTIES, LLC, a Limited Liability Company ("Tenant"). This agreement supersedes prior agreement 20-A11091, which will be terminated upon the execution of this agreement.

## BACKGROUND

Tenant desires to lease the aquatic lands commonly known as Commencement Bay, which are bedlands located in Pierce County, Washington, from State, and State desires to lease the property to Tenant pursuant to the terms and conditions of this Lease.  State has authority to enter into this Lease under Chapter 43.12, Chapter 43.30 and Title 79 of the Revised Code of Washington (RCW).

THEREFORE, the Parties agree as follows:

# SECTION 1 PROPERTY

**1.1    Property Defined.**

    (a)    State leases to Tenant and Tenant leases from State the real property described in Exhibit A together with all the rights of State, if any, to improvements on and easements benefiting the Property, but subject to the exceptions and restrictions set forth in this Lease (collectively the "Property").

    (b)    This Lease is subject to all valid interests of third parties noted in the records of Pierce County, or on file in the Office of the Commissioner of Public Lands, Olympia, Washington; rights of the public under the Public Trust Doctrine or federal navigation servitude; and treaty rights of Indian Tribes.

    (c)    This Lease does not include a right to harvest, collect or damage natural resources, including aquatic life or living plants; water rights; mineral rights; or a right to excavate or withdraw sand, gravel, or other valuable materials.

    (d)    State reserves the right to grant easements and other land uses on the Property to others when the easement or other land uses will not interfere unreasonably with the Permitted Use.

**1.2    Survey and Property Descriptions.**

    (a)    Tenant prepared Exhibit A, which describes the Property.  Tenant warrants that Exhibit A is a true and accurate description of the Lease boundaries and the improvements to be constructed or already existing in the Lease area.  Tenant's obligation to provide a true and accurate description of the Property boundaries is a material term of this Lease.

    (b)    State's acceptance of Exhibit A does not constitute agreement that Tenant's property description accurately reflects the actual amount of land used by Tenant. State reserves the right to retroactively adjust rent if at any time during the term of the Lease State discovers a discrepancy between Tenant's property description and the area actually used by Tenant.

**1.3    Inspection.**  State makes no representation regarding the condition of the Property, improvements located on the Property, the suitability of the Property for Tenant's Permitted Use, compliance with governmental laws and regulations, availability of utility rights, access to the Property, or the existence of hazardous substances on the Property.  Tenant inspected the Property and accepts it "AS IS."

# SECTION 2   USE

**2.1    Permitted Use.**  Tenant shall use the Property for moorage of pleasure crafts with necessary docks, floats, slips, pilings, ramps, breakwater and utilities required for operation of a marina, (the "Permitted Use"), and for no other purpose.  This is a water-dependent use. Exhibit B describes the Permitted Use in detail.  The Permitted Use is subject to additional obligations in Exhibit B.

**2.2     Restrictions on Permitted Use and Operations.** The following limitations apply to the Property and adjacent state-owned aquatic land. Tenant's compliance with the following does not limit Tenant's liability under any other provision of this Lease.

   (a)     Tenant shall not cause or permit:
       (1)     Damage to natural resources,
       (2)     Waste, or
       (3)     Deposit of material, unless approved by State in writing.  This prohibition includes deposit of fill, rock, earth, ballast, wood waste, refuse, garbage, waste matter, pollutants of any type, or other matter.

   (b)     Tenant shall not cause or permit scour or damage to aquatic land and vegetation. This prohibition includes the following limitations:
       (1)     Tenant shall not use or allow use of a pressure washer to clean underwater surfaces unless the water is deeper than seven (7) feet at the time.
       (2)     Tenant shall not allow moorage or anchorage of vessels in water more shallow than seven (7) feet at the extreme low tide or water.

   (c)     Tenant shall not construct new bulkheads or place hard bank armoring.

   (d)     Except as expressly permitted in Exhibit B, Tenant shall not install fixed breakwaters.

   (e)     Tenant shall not construct or install new covered moorage or boat houses.

   (f)     Unless approved by State in writing, Tenant shall not cause or permit dredging on the Property.  State will not approve dredging unless (1) required for flood control, maintenance of existing vessel traffic lanes, or maintenance of water intakes and (2) consistent with State's management plans, if any. Tenant shall maintain authorized dredge basins in a manner that prevents internal deeper pockets.

   (g)     Tenant shall limit the number of residential slips, and shall manage residential uses on the Property, in accordance with the provisions of WAC 332-30-171 and as specified in Exhibit B.

   (h)     Tenant shall not allow or authorize new floating houses.


**2.3     Conformance with Laws.**  Tenant shall, at all times, keep current and comply with all conditions and terms of permits, licenses, certificates, regulations, ordinances, statutes, and other government rules and regulations regarding Tenant's use or occupancy of the Property.

**2.4     Liens and Encumbrances.**  Unless expressly authorized by State in writing, Tenant shall keep the Property free and clear of liens or encumbrances arising from the Permitted Use or Tenant's occupancy of the Property.

## SECTION 3 TERM

**3.1     Term Defined.**  The term of this Lease is Thirty (30) years (the "Term"), beginning on the 1st day of July, 2013 (the "Commencement Date"), and ending on the 30 day of June, 2043 (the "Termination Date"), unless terminated sooner under the terms of this Lease.

**3.2     Renewal of the Lease.**  This Lease does not provide a right of renewal.  Tenant may apply for a new lease, which State has discretion to grant. Tenant must apply for a new lease at least one (1) year prior to Termination Date.  State will notify Tenant within ninety (90) days of its intent to approve or deny a new Lease.

**3.3     End of Term.**
    (a)     Upon the expiration or termination of this Lease, Tenant shall remove Improvements in accordance with Section 7, Improvements, and surrender the Property to State in the same or better condition as on the Commencement Date, reasonable wear and tear excepted.

    (b)     Definition of Reasonable Wear and Tear.
        (1)     Reasonable wear and tear is deterioration resulting from the Permitted Use that has occurred without neglect, negligence, carelessness, accident, or abuse of the Property by Tenant or any other person on the premises with the permission of Tenant.
        (2)     Reasonable wear and tear does not include unauthorized deposit of material prohibited under Paragraph 2.2 regardless of whether the deposit is incidental to or the byproduct of the Permitted Use.

    (c)     If Property is in worse condition, excepting for reasonable wear and tear, on the surrender date than on the Commencement Date, the following provisions apply.
        (1)     State shall provide Tenant a reasonable time to take all steps necessary to remedy the condition of the Property.  State may require Tenant to enter into a right-of-entry or other use authorization prior to the Tenant entering the Property if the Lease has terminated.
        (2)     If Tenant fails to remedy the condition of the Property in a timely manner, State may take steps reasonably necessary to remedy Tenant's failure. Upon demand by State, Tenant shall pay all costs of State's remedy, including but not limited to the costs of removing and disposing of material deposited improperly on the Property, lost revenue resulting from the condition of the Property, and administrative costs associated with the State's remedy.

**3.4     Holdover.**
    (a)     If Tenant remains in possession of the Property after the Termination Date, the occupancy will not be an extension or renewal of the Term.  The occupancy will be a month-to-month tenancy, on terms identical to the terms of this Lease, which either Party may terminate on thirty (30) days' written notice.

    (1)    The monthly rent during the holdover will be the same rent that would be due if the Lease were still in effect and all adjustments in rent were made in accordance with its terms.

    (2)    Payment of more than the monthly rent will not be construed to create a periodic tenancy longer than month-to-month.  If Tenant pays more than the monthly rent and State provides notice to vacate the property, State shall refund the amount of excess payment remaining after the Tenant ceases occupation of the Property.

    (b)    If State notifies Tenant to vacate the Property and Tenant fails to do so within the time set forth in the notice, Tenant will be a trespasser and shall owe the State all amounts due under RCW 79.02.300 or other applicable law.

## SECTION 4 RENT

**4.1**    **Annual Rent.**

    (a)    Until adjusted as set forth below, Tenant shall pay to State an annual rent of Forty Five Thousand Five Hundred Sixty One Dollars and Twelve Cents ($45,561.12).

    (b)    The annual rent, as it currently exists or as adjusted or modified (the "Annual Rent"), is paid in quarterly installments, each of which is equal to one-fourth (1/4) of the then-current Annual Rent.  The first installment, in the amount of Eleven Thousand Three Hundred Ninety Dollars and Twenty-eight Cents ($11,390.28), is due and payable in full on or before the Commencement Date and subsequent installments shall be due and payable in full on or before the same day of each third month thereafter. Any payment not paid by State's close of business on the date due is past due.

**4.2**    **Payment Place.**  Tenant shall make payment to Financial Management Division, 1111 Washington St SE, PO Box 47041, Olympia, WA 98504-7041.

**4.3**    **Adjustment Based on Use.**  Annual Rent is based on Tenant's Permitted Use of the Property, as described in Section 2 above.  If Tenant's Permitted Use changes, the Annual Rent shall be adjusted as appropriate for the changed use.

**4.4**    **Rent Adjustment Procedures.**

    (a)    Notice of Rent Adjustment.  State shall provide notice of adjustments to the Annual Rent allowed under Paragraphs 4.5 (b) to Tenant in writing no later than ninety (90) days after the anniversary date of the Lease.

    (b)    Procedures on Failure to make Timely Adjustment.  If the State fails to provide the notice required in Paragraph 4.4(a), State shall not collect the adjustment amount for the year in which State failed to provide notice.  Upon providing notice of adjustment, State may adjust and prospectively bill Annual Rent as if missed or waived adjustments had been implemented at the proper interval.  This includes the implementation of any inflation adjustment.

4.5 **Rent Adjustments for Water-Dependent Uses.**

    (a)    Inflation Adjustment.  State shall adjust water-dependent rent annually pursuant to RCW 79.105.200-.360, except in those years in which State revalues the rent under Paragraph 4.5(b) below.  This adjustment will be effective on the anniversary of the Commencement Date.

    (b)    Revaluation of Rent.  At the end of the first four-year period of the Term, and at the end of each subsequent four-year period, State shall revalue the water-dependent Annual Rent in accordance with RCW 79.105.200-.360.

    (c)    Rent Cap.  State shall increase rent incrementally in compliance with RCW 79.105.260 as follows:  If application of the statutory rent formula for water-dependent uses would result in an increase in the rent attributable to such uses of more than fifty percent (50%) in any one year, State shall limit the actual increase implemented in such year to fifty percent (50%) of the then-existing rent. In subsequent, successive years, State shall increase the rental amount incrementally until the State implements the full amount of increase as determined by the statutory rent formula.

## SECTION 5 OTHER EXPENSES

**5.1 Utilities.** Tenant shall pay all fees charged for utilities required or needed by the Permitted Use.

**5.2 Taxes and Assessments.** Tenant shall pay all taxes (including leasehold excise taxes), assessments, and other governmental charges applicable or attributable to the Property, Tenant's leasehold interest, the improvements, or Tenant's use and enjoyment of the Property.

**5.3 Right to Contest.** If in good faith, Tenant may contest any tax or assessment at its sole cost and expense.  At the request of State, Tenant shall furnish reasonable protection in the form of a bond or other security, satisfactory to State, against loss or liability resulting from such contest.

**5.4 Proof of Payment.** If required by State, Tenant shall furnish to State receipts or other appropriate evidence establishing the payment of amounts this Lease requires Tenant to pay.

**5.5 Failure to Pay.** If Tenant fails to pay amounts due under this Lease, State may pay the amount due, and recover its cost in accordance with Section 6.

## SECTION 6  LATE PAYMENTS AND OTHER CHARGES

**6.1 Failure to Pay Rent.** Failure to pay rent is a default by the Tenant. State may seek remedies under Section 14 as well as late charges and interest as provided in this Section 6.

**6.2     Late Charge.** If State does not receive full rent payment within ten (10) days of the date due, Tenant shall pay to State a late charge equal to four percent (4%) of the unpaid amount or Fifty Dollars ($50), whichever is greater, to defray the overhead expenses of State incident to the delay.

**6.3     Interest Penalty for Past Due Rent and Other Sums Owed.**

    (a)    Tenant shall pay interest on the past due rent at the rate of one percent (1%) per month until paid, in addition to paying the late charges determined under Paragraph 6.2. Rent not paid by the close of business on the due date will begin accruing interest the day after the due date.

    (b)    If State pays or advances any amounts for or on behalf of Tenant, Tenant shall reimburse State for the amount paid or advanced and shall pay interest on that amount at the rate of one percent (1%) per month from the date State notifies Tenant of the payment or advance. This includes, but is not limited to, State's payment of taxes of any kind, assessments, insurance premiums, costs of removal and disposal of materials or Improvements under any provision of this Lease, or other amounts not paid when due.

**6.4     Referral to Collection Agency and Collection Agency Fees.** If State does not receive full payment within thirty (30) days of the due date, State may refer the unpaid amount to a collection agency as provided by RCW 19.16.500 or other applicable law. Upon referral, Tenant shall pay collection agency fees in addition to the unpaid amount.

**6.5     No Accord and Satisfaction.** If Tenant pays, or State otherwise receives, an amount less than the full amount then due, State may apply such payment as it elects. State may accept payment in any amount without prejudice to State's right to recover the balance of the rent or pursue any other right or remedy. No endorsement or statement on any check, any payment, or any letter accompanying any check or payment constitutes accord and satisfaction.

**6.6     No Counterclaim, Setoff, or Abatement of Rent.** Except as expressly set forth elsewhere in this Lease, Tenant shall pay rent and all other sums payable by Tenant without the requirement that State provide prior notice or demand. Tenant's payment is not subject to counterclaim, setoff, deduction, defense or abatement.

## SECTION 7   IMPROVEMENTS

**7.1     Improvements Defined.**

    (a)    "Improvements," consistent with RCW 79.105 through 79.145, are additions within, upon, or attached to the land. This includes, but is not limited to, fill, structures, bulkheads, docks, pilings, and other fixtures.

    (b)    "Personal Property" means items that can be removed from the Property without (1) injury to the Property or Improvements or (2) diminishing the value or utility of the Property or Improvements.

(c)     "State-Owned Improvements" are Improvements made or owned by State. State-Owned Improvements includes any construction, alteration, or addition to State-Owned Improvements made by Tenant.

(d)     "Tenant-Owned Improvements" are Improvements authorized by State and (1) made by Tenant or (2) acquired by Tenant from the prior tenant.

(e)     "Unauthorized Improvements" are Improvements made on the Property without State's prior consent or Improvements made by Tenant that do not conform to plans submitted to and approved by the State.

**7.2     Existing Improvements.**  On the Commencement Date, the following Improvements are located on the Property:  gangway, anchored pontoon breakwater, west breakwater, pilings, finger piers, floats, and covered moorage.  The Improvements are Tenant-Owned Improvements.

**7.3     Construction, Major Repair, Modification, and Demolition.**

(a)     This Paragraph 7.3 governs construction, alteration, replacement, major repair, modification, demolition, and deconstruction of Improvements ("Work").  Section 11 governs routine maintenance and minor repair.

(b)     All Work must conform to requirements under Paragraph 7.4. Paragraph 11.3, which applies to routine maintenance and minor repair, also applies to all Work under this Paragraph 7.3.

(c)     Except in an emergency, Tenant shall not conduct Work, without State's prior written consent, as follows:

(1)     State may deny consent if State determines that denial is in the best interests of the State or if proposed Work does not comply with Paragraphs 7.4 and 11.3. State may impose additional conditions reasonably intended to protect and preserve the Property. If Work is for removal of Improvements at End of Term, State may waive removal of some or all Improvements.

(2)     Except in an emergency, Tenant shall submit to State plans and specifications describing the proposed Work at least sixty (60) days before submitting permit applications to regulatory authorities unless Tenant and State otherwise agree to coordinate permit applications.  At a minimum, or if no permits are necessary, Tenant shall submit plans and specifications at least ninety (90) days before commencement of Work.

(3)     State waives the requirement for consent if State does not notify Tenant of its grant or denial of consent within sixty (60) days of submittal.

(d)     Tenant shall notify State of emergency Work within five (5) business days of the start of such Work.  Upon State's request, Tenant shall provide State with plans and specifications or as-builts of emergency Work.

(e)     Tenant shall not commence or authorize Work until Tenant has:

(1)     Obtained a performance and payment bond in an amount equal to one hundred twenty-five percent (125%) of the estimated cost of construction. Tenant shall maintain the performance and payment bond until Tenant pays in full the costs of the Work, including all laborers and material persons.

(2)     Obtained all required permits.

(f)    Before completing Work, Tenant shall remove all debris and restore the Property to an orderly and safe condition. If Work is intended for removal of Improvements at End of Term, Tenant shall restore the Property in accordance with Paragraph 3.3, End of Term.

(g)    Upon completing work, Tenant shall promptly provide State with as-built plans and specifications.

(h)    State shall not charge rent for authorized Improvements installed by Tenant during this Term of this Lease, but State may charge rent for such Improvements when and if Tenant or successor obtains a subsequent use authorization for the Property and State has waived the requirement for Improvements to be removed as provided in Paragraph 7.5.

**7.4    Standards for Work.**

(a)    Applicability of Standards for Work

(1)    The standards for Work in Paragraph 7.4(b) apply to Work commenced in the five year period following the Commencement Date and to Proposed Facilities described in Exhibit B. Work has commenced if State has approved plans and specifications.

(2)    If Tenant undertakes Work five years or more after the Commencement Date, Tenant shall comply with State's then current standards for Work.

(3)    At Tenant's option, Tenant may ascertain State's current standards for Work as follows:

(i)    Before submitting plans and specifications for State's approval as required by Paragraph 7.3 of the Lease, Tenant shall request State to provide Tenant with then current standards for Work on State-owned Aquatic Lands.

(ii)    Within thirty (30) days of receiving Tenant's request, State shall provide Tenant with current standards for Work, which will be effective for the purpose of State's approval of Tenant's proposed Work provided Tenant submits plans and specifications for State's approval within two (2) years of Tenant's request for standards. .

(iii)    If State does not timely provide current standards upon Tenant's request, the standards under Paragraph 7.4(b) apply to Tenant's Work provided Tenant submits plans and specifications as required by Paragraph 7.3 within two (2) years of Tenant's request for standards.

(iv)    If Tenant fails to (1) make a request for current standards or (2) timely submit plans and specifications to State after receiving current standards, Tenant shall make changes in plans or Work necessary to conform to current standards for Work upon State's demand.

(b)    Standards for Work

(1)    State will not approve plans to construct new Improvements or expand existing Improvements in or over habitats designated by State as important habitat. Tenant shall confirm location of important habitat on Property, if

any, with State before submitting plans and specifications in accordance with Paragraph 7.3.

(2)    Tenant shall not install skirting on any overwater structure.

(3)    Tenant shall not conduct in-water Work during time periods prohibited for such work under WAC 220-110-271, Prohibited Work Times in Saltwater, as amended, or as otherwise directed by the Washington Department of Fish and Wildlife (WDFW).

(4)    Tenant shall not provide anchorage or moorage in water more shallow than 7 feet (2 meters) at the extreme low tide or water.

(5)    Tenant shall install unobstructed grating over at least 50 percent of the surface area of all new floats, piers, fingers, docks, and gangways; grating material must have at least 60 percent  unobstructed open space.

(6)    Where Work is in or within 200 feet of spawning habitat for Pacific Herring (Clupea harengus), Surf Smelt (Hypomesus pretiosus), and Sand Lance (Ammodytes hexapterus), Tenant shall construct all new or expansions to existing Improvements to avoid (1) removal of shoreline vegetation within the Property that provides shading to the upper intertidal zone, (2) changes in typical spawning behavior, (3) destruction or disturbance of spawning substrate or aquatic vegetation used for spawning, and (4) interruption of existing sediment transport mechanisms such as longshore current or wave energy.

(7)    Tenant shall meet the following minimum sewage management standards. If, at the time Tenant applies for regulatory permits, a regulatory agency requires more or fewer facilities, Tenant shall comply with the standard requiring more facilities.

    (i)     Tenant shall provide at least 1 (one) sewage pumpout facility in all marinas with more than 10 boat slips.

    (ii)    Tenant shall provide sewage management facilities at a ratio of at least 1 (one) pumpout station and 1 (one) dump station per every 300 boats over 16 feet in length.

    (iii)   For marinas with 100 or less boats with a holding tank or portable toilet, Tenant shall provide sewage holding tank capacity in a ratio of at least 15 gallons per boat. Sewage holding tanks must have a minimum capacity of 300 gallons. For marinas with more than 100 boats with a holding tank or portable toilet, Tenant shall provide at sewage holding tank with a capacity of at least 2,000 gallons.

(8)    Regardless of new construction or rebuilding an existing ramp, Tenant shall construct boat ramps and launches to minimize:

    (i)     interruption of longshore current,

    (ii)    alteration of existing sediment transport mechanisms (wave energy, longshore current, or other), and

    (iii)    impacts to pacific herring (clupea haregus), surf smelt (hypomesus pretiosus), sand lance (ammodytes hexapterus).

**7.5     Tenant-Owned Improvements at End of Lease.**

(a)     Disposition

(1)     Tenant shall remove Tenant-Owned Improvements in accordance with Paragraph 7.3 upon the expiration, termination, or cancellation of the Lease unless State waives the requirement for removal.

(2)     Tenant-Owned Improvements remaining on the Property on the expiration, termination or cancellation date shall become State-Owned Improvements without payment by State, unless State elects otherwise. State may refuse or waive ownership.  If RCW 79.125.300 or 79.130.040 apply at the time this Lease expires, Tenant could be entitled to payment by the new tenant for Tenant-Owned Improvements.

(3)     If Tenant-Owned Improvements remain on the Property after the expiration, termination, or cancellation date without State's consent, State may remove all Improvements and Tenant shall pay State's costs.

(b)     Conditions Under Which State May Waive Removal of Tenant-Owned Improvements.

(1)     State may waive removal of some or all Tenant-Owned Improvements whenever State determines that it is in the best interests of the State and regardless of whether Tenant re-leases the Property.

(2)     If Tenant re-leases the Property, State may waive requirement to remove Tenant-Owned Improvements.  State also may consent to Tenant's continued ownership of Tenant-Owned Improvements.

(3)     If Tenant does not re-lease the Property, State may waive requirement to remove Tenant-Owned Improvements upon consideration of a timely request from Tenant, as follows:

(i)     Tenant must notify State at least one (1) year before the Termination Date of its request to leave Tenant-Owned Improvements.

(ii)    State, within ninety (90) days of receiving Tenant's notification, will notify Tenant whether State consents to some or all Tenant-Owned Improvements remaining. State has no obligation to grant consent.

(iii)   State's failure to respond to Tenant's request to leave Improvements within ninety (90) days is a denial of the request.

(c)     Tenant's Obligations if State Waives Removal.

(1)     Tenant shall not remove Improvements if State waives the requirement for removal of some or all Tenant-Owned Improvements.

(2)     Tenant shall maintain such Improvements in accordance with this Lease until the expiration, termination, or cancellation date.  Tenant is liable to State for cost of repair if Tenant causes or allows damage to Improvements State has designated to remain.

**7.6     Disposition of Unauthorized Improvements.**

(a)     Unauthorized Improvements belong to State, unless State elects otherwise.

(b)     State may either:

(1)     Consent to Tenant ownership of the Improvements, or

    (2)    Charge rent for use of the Improvements from the time of installation or construction and

        (i)    Require Tenant to remove the Improvements in accordance with Paragraph 7.3, in which case Tenant shall pay rent for the Improvements until removal, or

        (ii)    Consent to Improvements remaining and Tenant shall pay rent for the use of the Improvements, or

        (iii)    Remove Improvements and Tenant shall pay for the cost of removal and disposal, in which case Tenant shall pay rent for use of the Improvements until removal and disposal.

**7.7    Disposition of Personal Property.**

    (a)    Tenant retains ownership of Personal Property unless Tenant and State agree otherwise in writing.

    (b)    Tenant shall remove Personal Property from the Property by the Termination Date.  Tenant is liable for damage to the Property and Improvements resulting from removal of Personal Property.

    (c)    State may sell or dispose of all Personal Property left on the Property after the Termination Date.

        (1)    If State conducts a sale of Personal Property, State shall apply proceeds first to the State's administrative costs in conducting the sale, second to payment of amount that then may be due from the Tenant to the State. State shall pay the remainder, if any, to the Tenant.

        (2)    If State disposes of Personal Property, Tenant shall pay for the cost of removal and disposal.

## SECTION 8   ENVIRONMENTAL LIABILITY/RISK ALLOCATION

**8.1    Definitions.**

    (a)    "Hazardous Substance" means any substance that now or in the future becomes regulated or defined under any federal, state, or local statute, ordinance, rule, regulation, or other law relating to human health, environmental protection, contamination, pollution, or cleanup.

    (b)    "Release or threatened release of Hazardous Substance" means a release or threatened release as defined under any law described in Paragraph 8.1(a).

    (c)    "Utmost care" means such a degree of care as would be exercised by a very careful, prudent, and competent person under the same or similar circumstances; the standard of care applicable under the Washington State Model Toxics Control Act ("MTCA"), Chapter 70.105 RCW, as amended.

    (d)    "Tenant and affiliates" when used in this Section 8 means Tenant or Tenant's subtenants, contractors, agents, employees, guests, invitees, licensees, affiliates, or any person on the Property with the Tenant's permission.

(e)  "Liabilities" as used in this Section 8 means any claims, demands, proceedings, lawsuits, damages, costs, expenses, fees (including attorneys' fees and disbursements), penalties, or judgments.

**8.2   General Conditions.**

(a)  Tenant's obligations under this Section 8 extend to the area in, on, under, or above
   (1)  The Property and
   (2)  Adjacent state-owned aquatic lands if affected by a release of Hazardous Substances that occurs as a result of the Permitted Use.

(b)  Standard of Care.
   (1)  Tenant shall exercise the utmost care with respect to Hazardous Substances.
   (2)  Tenant shall exercise utmost care for the foreseeable acts or omissions of third parties with respect to Hazardous Substances, and the foreseeable consequences of those acts or omissions, to the extent required to establish a viable, third-party defense under the law.

**8.3   Current Conditions and Duty to Investigate.**

(a)  State makes no representation about the condition of the Property.  Hazardous Substances may exist in, on, under, or above the Property.

(b)  This Lease does not impose a duty on State to conduct investigations or supply information to Tenant about Hazardous Substances.

(c)  Tenant is responsible for conducting all appropriate inquiry and gathering sufficient information about the existence, scope, and location of Hazardous Substances on or near the Property necessary for Tenant to meet Tenant's obligations under this Lease and utilize the Property for the Permitted Use.

**8.4   Use of Hazardous Substances.**

(a)  Tenant and affiliates shall not use, store, generate, process, transport, handle, release, or dispose of Hazardous Substances, except in accordance with all applicable laws.

(b)  Tenant shall not undertake, or allow others to undertake by Tenant's permission, acquiescence, or failure to act, activities that result in a release or threatened release of Hazardous Substances.

(c)  If use of Hazardous Substances related to Tenant's use or occupancy of the Property results in violation of law:
   (1)  Tenant shall submit to State any plans for remedying the violations, and
   (2)  Tenant shall implement any remedial measures to restore the Property or natural resources that State may require in addition to remedial measures required by regulatory authorities.

(d)  At a minimum, Tenant and affiliates shall observe the following Hazardous Substances operational standards. If the Washington Department of Ecology, U.S. Environmental Protection Agency or other regulatory agency establishes different standards applicable to Tenant's activities under the Permitted Use, Tenant shall meet the standard that provides greater protection to the environment.

    (1)    Tenant shall not allow work on overwater structures or vessels without protective measures to prevent discharge of toxins to the water, including:

        (i)    Tenant shall not cause or allow underwater hull scraping and other underwater removal of paints.

        (ii)    Tenant shall not cause or allow underwater refinishing work from boats or temporary floats unless permitted by an industrial National Pollution Discharge Elimination System (NPDES) permit.

        (iii)    Tenant shall not cause or allow above the waterline boat repairs or refinishing in-water except if limited to decks and superstructures and less than 25 percent of a boat is repaired or refinished in-water per year.

        (iv)    Tenant shall use and require others to use tarps and other dust, drip and spill containment measures when repairing or refinishing boats in water.

    (2)    Tenant shall not store or allow others to store fuel tanks, petroleum products, hydraulic fluid, machinery coolants, lubricants and chemicals not in use in locations above the water surface.

    (3)    Tenant shall inspect all equipment using petroleum products, hydraulic fluids, machinery coolants, chemicals, or other toxic or deleterious materials on a monthly basis and immediately make all repairs necessary to stop leakage.  Tenant shall submit to State an annual report documenting inspections and repair.

    (4)    Tenant shall maintain a supply of oil spill containment materials adequate to contain a spill from the largest vessel in use on the Property.

    (5)    Tenant shall not use or allow use of a pressure washer at any location above the water surface to clean any item that uses petroleum products.

  (e)    Tenant shall incorporate best management practices to prevent the release of chemical contaminants, wastewater, garbage and other pollutants, as specified in Resource Manual for Pollution Prevention in Marinas published by the Washington Department of Ecology, publication number 98-11, available at http://www.ecy.wa.gov/biblio/9811.html.  If the Department of Ecology or other regulatory agency establishes different standards, Tenant shall meet the most protective standard.

## 8.5   Management of Contamination, if any.

  (a)    Tenant and affiliates shall not undertake activities that:

    (1)    Damage or interfere with the operation of remedial or restoration activities, if any;

    (2)    Result in human or environmental exposure to contaminated sediments, if any;

    (3)    Result in the mechanical or chemical disturbance of on-site habitat mitigation, if any.

  (b)    If requested, Tenant shall allow reasonable access to:

(1) Employees and authorized agents of the Environmental Protection Agency, the Washington State Department of Ecology, health department, or other similar environmental agencies; and

(2) Potentially liable or responsible parties who are the subject of an order or consent decree that requires access to the Property. Tenant may negotiate an access agreement with such parties, but Tenant may not unreasonably withhold such agreement.

**8.6   Notification and Reporting.**

(a) Tenant shall immediately notify State if Tenant becomes aware of any of the following:

(1) A release or threatened release of Hazardous Substances;

(2) Any new discovery of or new information about a problem or liability related to, or derived from, the presence of Hazardous Substances;

(3) Any lien or action arising from Hazardous Substances;

(4) Any actual or alleged violation of any federal, state, or local statute, ordinance, rule, regulation, or other law pertaining to Hazardous Substances;

(5) Any notification from the US Environmental Protection Agency (EPA) or the Washington State Department of Ecology (DOE) that remediation or removal of Hazardous Substances is or may be required at the Property.

(b) Tenant's duty to report under Paragraph 8.6(a) extends to lands described in Paragraph 8.2(a) and to any other property used by Tenant in conjunction with the Property if a release of Hazardous Substances on the other property could affect the Property.

(c) Tenant shall provide State with copies of all documents Tenant submits to any federal, state or local authorities concerning environmental impacts or proposals relative to the Property. Documents subject to this requirement include, but are not limited to, applications, reports, studies, or audits for National Pollution Discharge and Elimination System Permits; Army Corps of Engineers permits; State Hydraulic Project Approvals (HPA); State Water Quality certification; Substantial Development permit; and any reporting necessary for the existence, location, and storage of Hazardous Substances on the Property.

**8.7   Indemnification.**

(a) Tenant shall fully indemnify, defend, and hold State harmless from and against Liabilities that arise out of, or relate to:

(1) The use, storage, generation, processing, transportation, handling, or disposal of any Hazardous Substance by Tenant and affiliates occurring whenever Tenant occupies or has occupied the Property;

(2) The release or threatened release of any Hazardous Substance resulting from any act or omission of Tenant and affiliates occurring whenever Tenant occupies or has occupied the Property.

(b) Tenant shall fully indemnify, defend, and hold State harmless for Liabilities that arise out of or relate to Tenant's breach of obligations under Paragraph 8.5.

(c)     Tenant has no duty to indemnify State for acts or omissions of third parties unless and only if an administrative or legal proceeding arising from a release or threatened release of Hazardous Substances finds or holds that Tenant failed to exercise care as described in  Paragraph 8.2(b)(2)). In such case, Tenant shall fully indemnify, defend, and hold State harmless from and against Liabilities arising from the acts or omissions of third parties in relation to the release or threatened release of Hazardous Substances.  This includes Liabilities arising before the finding or holding in the proceeding.

**8.8     Reservation of Rights.**

(a)     For Liabilities not covered by the indemnification provisions of Paragraph 8.7, the Parties expressly reserve and do not waive any rights, claims, immunities, causes of action, or defenses relating to Hazardous Substances that either Party may have against the other under law.

(b)     The Parties expressly reserve all rights, claims, immunities, and defenses either Party may have against third parties. Nothing in this Section 8 benefits or creates rights for third parties.

(c)     The allocations of risks, Liabilities, and responsibilities set forth in this Section 8 do not release either Party from or affect the liability of either Party for Hazardous Substances claims or actions by regulatory agencies.

**8.9     Cleanup.**

(a)     If Tenant's act, omission, or breach of obligation under Paragraph 8.4 results in a release of Hazardous Substances that exceeds the threshold limits of any applicable regulatory standard, Tenant shall, at Tenant's sole expense, promptly take all actions necessary or advisable to clean up the Hazardous Substances in accordance with applicable law.

(b)     Tenant may undertake a cleanup of the Property pursuant to the Washington State Department of Ecology's Voluntary Cleanup Program, provided that Tenant cooperates with the Department of Natural Resources  in development of cleanup plans.  Tenant shall not proceed with Voluntary Cleanup without the Department of Natural Resources approval of final plans.  Nothing in the operation of this provision is an agreement by the Department of Natural Resources that the Voluntary Cleanup complies with any laws or with the provisions of this Lease. Tenant's completion of a Voluntary Cleanup is not a release from or waiver of any obligation for Hazardous Substances under this Lease.

**8.10   Sampling by State, Reimbursement, and Split Samples.**

(a)     State may enter the Property and conduct sampling, tests, audits, surveys, or investigations ("Tests") of the Property at any time to determine the existence, scope, or effects of Hazardous Substances.

(b)     If such Tests, along with any other information, demonstrate a breach of Tenant's obligations regarding Hazardous Substances under this Lease, Tenant shall promptly reimburse State for all costs associated with the Tests, provided State gave Tenant thirty (30) calendar days advance notice in nonemergencies and reasonably practical notice in emergencies.

(c)   In nonemergencies, Tenant is entitled to obtain split samples of Test samples, provided Tenant gives State written notice requesting split samples at least ten (10) calendar days before State conducts Tests.  Upon demand, Tenant shall promptly reimburse State for additional cost, if any, of split samples.

(d)   If either Party conducts Tests on the Property, the conducting Party shall provide the other with validated final data and quality assurance/quality control/chain of custody information about the Tests within sixty (60) calendar days of a written request by the other party, unless Tests are part of a submittal under Paragraph 8.6(c) in which case Tenant shall submit data and information to State without written request by State. Neither party is obligated to provide any analytical summaries or the work product of experts.

## SECTION 9 ASSIGNMENT AND SUBLETTING

**9.1**   **State Consent Required.**  Tenant shall not convey, transfer, or encumber any part of Tenant's interest in this Lease or the Property without State's prior written consent, which State shall not unreasonably condition or withhold.

(a)   In determining whether to consent, State may consider, among other items, the proposed transferee's financial condition, business reputation and experience, the nature of the proposed transferee's business, the then-current value of the Property, and such other factors as may reasonably bear upon the suitability of the transferee as a tenant of the Property.  Tenant shall submit information regarding any proposed transferee to State at least thirty (30) days prior to the date of the proposed transfer.

(b)   State reserves the right to condition its consent upon:

(1)   changes in the terms and conditions of this Lease, including, but not limited to, the Annual Rent; and/or

(2)   the agreement of Tenant or transferee to conduct Tests for Hazardous Substances on the Property or on other property owned or occupied by Tenant or the transferee.

(c)   Each permitted transferee shall assume all obligations under this Lease, including the payment of rent.  No assignment, sublet, or transfer shall release, discharge, or otherwise affect the liability of Tenant.

(d)   State's consent under this Paragraph 9.1 does not constitute a waiver of any claims against Tenant for the violation of any term of this Lease.

**9.2**   **Rent Payments Following Assignment.**  The acceptance by State of the payment of rent following an assignment or other transfer does not constitute consent to any assignment or transfer.

**9.3**   **Terms of Subleases.**

(a)   Tenant shall submit the terms of all subleases to State for approval.

(b)   Tenant shall incorporate the following requirements in all subleases:

(1)   The sublease must be consistent with and subject to all the terms and conditions of this Lease;

(2)    The sublease must provide that this Lease controls if the terms of the sublease conflict with the terms of this Lease;

(3)    The term of the sublease (including any period of time covered by a renewal option) must end before the Termination Date of the initial Term or any renewal term;

(4)    The sublease must terminate if this Lease terminates for any reason;

(5)    The subtenant must receive and acknowledge receipt of a copy of this Lease;

(6)    The sublease must prohibit the prepayment to Tenant by the subtenant of more than the quarterly installment;

(7)    The sublease must identify the rental amount subtenant is to pay to Tenant;

(8)    The sublease must provide that there is no privity of contract between the subtenant and State;

(9)    The sublease must require removal of the subtenant's Improvements and Personal Property upon termination of the sublease;

(10)    The subtenant's permitted use must be within the scope of the Permitted Use; and

(11)    The sublease must require the subtenant to meet all obligations of Tenant under Section 10, Indemnification, Financial Security, and Insurance.

**9.4    Short-Term Subleases of Moorage Slips.** Short-term subleasing of moorage slips for a term of less than one year does not require State's written consent or approval pursuant to Paragraphs 9.1 or 9.3. Tenant shall conform moorage sublease agreements to the sublease requirements in Paragraph 9.3.

**9.5    Event of Assignment.** If Tenant is a corporation, dissolution of the corporation or a transfer (by one or more transactions) of a majority of the voting stock of Tenant is an assignment of this Lease. If Tenant is a partnership, dissolution of the partnership or a transfer (by one or more transactions) of the controlling interest in Tenant is an assignment of this Lease. Assignments defined in this Paragraph 9.5 require State's consent under Paragraph 9.1.

## SECTION 10  INDEMNITY, FINANCIAL SECURITY, INSURANCE

**10.1    Indemnity.**

(a)    Tenant shall indemnify, defend, and hold State, its employees, officers, and agents harmless from Claims arising out of the use, occupation, or control of the Property by Tenant, its subtenants, contractors, agents, invitees, guests, employees, affiliates, licensees, or permittees.

(b)    "Claim" as used in this Paragraph 10.1 means any financial loss, claim, suit, action, damages, expenses, fees (including attorneys' fees), penalties, or judgments attributable to bodily injury, sickness, disease, death, and damages to tangible property, including, but not limited to, land, aquatic life, and other natural resources. "Damages to tangible property" includes, but is not limited to,

physical injury to the Property and damages resulting from loss of use of the Property.

(c)    State shall not require Tenant to indemnify, defend, and hold State harmless for claims that arise solely out of the willful or negligent act of State or State's elected officials, employees, or agents.

(d)    Tenant waives its immunity under Title 51 RCW to the extent it is required to indemnify, defend, and hold State and its agencies, officials, agents, or employees harmless.

(e)    Section 8, Environmental Liability/Risk Allocation, exclusively shall govern Tenant's liability to State for Hazardous Substances and its obligation to indemnify, defend, and hold State harmless for Hazardous Substances.

**10.2   Insurance Terms.**

(a)    Insurance Required.

    (1)    At its own expense, Tenant shall procure and maintain during the Term of this Lease, the insurance coverages and limits described in this Paragraph 10.2 and in Paragraph 10.3, Insurance Types and Limits.  State may terminate this Lease if Tenant fails to maintain required insurance.

    (2)    Unless State agrees to an exception, Tenant shall provide insurance issued by an insurance company or companies admitted to do business in the State of Washington and have a rating of A- or better by the most recently published edition of Best's Reports.  Tenant may submit a request to the risk manager for the Department of Natural Resources to approve an exception to this requirement.  If an insurer is not admitted, the insurance policies and procedures for issuing the insurance policies shall comply with Chapter 48.15 RCW and 284-15 WAC.

    (3)    All general liability, excess, umbrella, property, builder's risk, and pollution legal liability insurance policies must name the State of Washington, the Department of Natural Resources, its elected and appointed officials, agents, and employees as an additional insured.

    (4)    All insurance provided in compliance with this Lease must be primary as to any other insurance or self-insurance programs afforded to or maintained by State.

(b)    Waiver.

    (1)    Tenant waives all rights against State for recovery of damages to the extent insurance maintained pursuant to this Lease covers these damages.

    (2)    Except as prohibited by law, Tenant waives all rights of subrogation against State for recovery of damages to the extent that they are covered by insurance maintained pursuant to this lease.

(c)    Proof of Insurance.

    (1)    Tenant shall provide State with a certificate(s) of insurance executed by a duly authorized representative of each insurer, showing compliance with insurance requirements specified in this Lease and, if requested, copies of policies to State.

(2)    The certificate(s) of insurance must reference additional insureds and the Lease number.

(3)    Receipt of such certificates or policies by State does not constitute approval by State of the terms of such policies.

(d)    State must receive written notice before cancellation or non-renewal of any insurance required by this Lease, as follows:

(1)    Insurers subject to RCW 48.18 (admitted and regulated by the Insurance Commissioner):  If cancellation is due to non-payment of premium, provide State ten (10) days' advance notice of cancellation; otherwise, provide State forty-five (45) days' advance notice of cancellation or non-renewal.

(2)    Insurers subject to RCW 48.15 (surplus lines):  If cancellation is due to non-payment of premium, provide State ten (10) days' advance notice of cancellation; otherwise, provide State thirty (30) days' advance notice of cancellation or non-renewal.

(e)    Adjustments in Insurance Coverage.

(1)    State may impose changes in the limits of liability for all types of insurance as State deems necessary.

(2)    Tenant shall secure new or modified insurance coverage within thirty (30) days after State requires changes in the limits of liability.

(f)    If Tenant fails to procure and maintain the insurance described above within fifteen (15) days after Tenant receives a notice to comply from State, State may either:

(1)    Deem the failure an Event of Default under Section 14, or

(2)    Procure and maintain comparable substitute insurance and pay the premiums.  Upon demand, Tenant shall pay to State the full amount paid by State, together with interest at the rate provided in Paragraph 6.2 from the date of State's notice of the expenditure until Tenant's repayment.

(g)    General Terms.

(1)    State does not represent that coverage and limits required under this Lease are adequate to protect Tenant.

(2)    Coverage and limits do not limit Tenant's liability for indemnification and reimbursements granted to State under this Lease.

(3)    The Parties shall use any insurance proceeds payable by reason of damage or destruction to property first to restore the real property covered by this Lease, then to pay the cost of the reconstruction, then to pay the State any sums in arrears, and then to Tenant.

**10.3    Insurance Types and Limits.**

(a)    General Liability Insurance.

(1)    Tenant shall maintain commercial general liability insurance (CGL) or marine general liability (MGL) covering claims for bodily injury, personal injury, or property damage arising on the Property and/or arising out of Tenant's use, occupation, or control of the Property and, if necessary, commercial umbrella insurance with a limit of not less than Two Million

Dollars ($2,000,000) per each occurrence.  If such CGL or MGL insurance contains aggregate limits, the general aggregate limit must be at least twice the "each occurrence" limit.  CGL or MGL insurance must have products-completed operations aggregate limit of at least two times the "each occurrence" limit.

(2)    CGL insurance must be written on Insurance Services Office (ISO) Occurrence Form CG 00 01 (or a substitute form providing equivalent coverage).  All insurance must cover liability arising out of premises, operations, independent contractors, products completed operations, personal injury and advertising injury, and liability assumed under an insured contract (including the tort liability of another party assumed in a business contract) and contain separation of insured (cross-liability) condition.

(3)    MGL insurance must have no exclusions for non-owned watercraft.

(b)    Workers' Compensation.

    (1)    State of Washington Workers' Compensation.

        (i)    Tenant shall comply with all State of Washington workers' compensation statutes and regulations.  Tenant shall provide workers' compensation coverage for all employees of Tenant. Coverage must include bodily injury (including death) by accident or disease, which arises out of or in connection with Tenant's use, occupation, and control of the Property.

        (ii)    If Tenant fails to comply with all State of Washington workers' compensation statutes and regulations and State incurs fines or is required by law to provide benefits to or obtain coverage for such employees, Tenant shall indemnify State.  Indemnity shall include all fines; payment of benefits to Tenant, employees, or their heirs or legal representatives; and the cost of effecting coverage on behalf of such employees.

    (2)    Longshore and Harbor Workers' and Jones Acts.  Longshore and Harbor Workers' Act (33 U.S.C. Section 901 *et seq.*) and/or the Jones Act (46 U.S.C. Section 688) may require Tenant to provide insurance coverage in some circumstances.   Tenant shall ascertain if such insurance is required and, if required, shall maintain insurance in compliance with law.  Tenant is responsible for all civil and criminal liability arising from failure to maintain such coverage.

(c)    Employers' Liability Insurance.  Tenant shall procure employers' liability insurance, and, if necessary, commercial umbrella liability insurance with limits not less than Two Million Dollars ($2,000,000) each accident for bodily injury by accident or Two Million Dollars ($2,000,000) each employee for bodily injury by disease.

(d)    Property Insurance.

    (1)    Tenant shall buy and maintain property insurance covering all real property and fixtures, equipment, tenant improvements and betterments (regardless of whether owned by Tenant or State).  Such insurance must be written on an all risks basis and, at minimum, cover the perils insured

under ISO Special Causes of Loss Form CP 10 30, and cover the full replacement cost of the property insured. Such insurance may have commercially reasonable deductibles. Any coinsurance requirement in the policy must be waived. The policy must include State as an insured and a loss payee.

(2) Tenant shall buy and maintain boiler and machinery insurance required by contract documents or by law, covering all real property and fixtures, equipment, tenant improvements and betterments (regardless of whether owned by Tenant or State) from loss or damage caused by the explosion of boilers, fired or unfired vessels, electric or steam generators, or pipes.

(3) In the event of any loss, damage, or casualty which is covered by one or more of the types of insurance described above, the Parties to this Lease shall proceed cooperatively to settle the loss and collect the proceeds of such insurance, which State shall hold in trust, including interest earned by State on such proceeds, for use according to the terms of this Lease. The Parties shall use insurance proceeds in accordance with Paragraph 10.2(g)(3).

(4) When sufficient funds are available, using insurance proceeds described above, the Parties shall continue with reasonable diligence to prepare plans and specifications for, and thereafter carry out, all work necessary to:

(i) Repair and restore damaged building(s) and/or Improvements to their former condition, or

(ii) Replace and restore damaged building(s) and/or Improvements with a new building(s) and/or Improvements on the Property of a quality and usefulness at least equivalent to or more suitable than, damaged building(s) and/or Improvements.

(e) Builder's Risk Insurance.

(1) Tenant shall procure and maintain in force, or require its contractor(s) to procure and maintain in force, builder's risk insurance on the entire work during the period construction is in progress and until completion of the project and acceptance by State. Such insurance must be written on a completed form and in an amount equal to the value of the completed building and/or Improvements, subject to subsequent modifications to the sum. The insurance must be written on a replacement cost basis. The insurance must name Tenant, all contractors, and subcontractors in the work as insured. State must be named additional insured as required by Paragraph 10.2(a)(3)).

(2) Insurance described above must cover or include the following:

(i) All risks of physical loss except those specifically excluded in the policy, including loss or damage caused by collapse;

(ii) The entire work on the Property, including reasonable compensation for architect's services and expenses made necessary by an insured loss;

(iii) Portions of the work located away from the Property but intended for use at the Property, and portions of the work in transit;

        (iv)    Scaffolding, falsework, and temporary buildings located on the Property; and

        (v)     The cost of removing debris, including all demolition as made legally necessary by the operation of any law, ordinance, or regulation.

    (3)    Tenant or Tenant's(s) contractor(s) is responsible for paying any part of any loss not covered because of application of a deductible contained in the policy described above.

    (4)    Tenant or Tenant's(s) contractor shall buy and maintain boiler and machinery insurance required by contract documents or by law, covering insured objects during installation and until final acceptance by permitting authority.  If testing is performed, such insurance must cover such operations.  The insurance must name Tenant, all contractors, and subcontractors in the work as insured.  State must be named additional insured as required by Paragraph 10.2(a)(3)).

(f)    Business Auto Policy Insurance.

    (1)    Tenant shall maintain business auto liability insurance and, if necessary, commercial umbrella liability insurance with a limit not less than Two Million Dollars ($2,000,000) per accident.  Such insurance must cover liability arising out of "Any Auto".

    (2)    Business auto coverage must be written on ISO Form CA 00 01, or substitute liability form providing equivalent coverage.  If necessary, the policy must be endorsed to provide contractual liability coverages and cover a "covered pollution cost or expense" as provided in the 1990 or later editions of CA 00 01.

## 10.4   Financial Security.

(a)    At its own expense, Tenant shall procure and maintain during the Term of this Lease a corporate security bond or provide other financial security that State, at its option, may approve ("Security").  Tenant shall provide Security in an amount equal to One Hundred Thousand Dollars ($100,000.00), which is consistent with RCW 79.105.330, and secures Tenant's performance of its obligations under this Lease, with the exception of the obligations under Section 8, Environmental Liability/Risk Allocation.  Tenant's failure to maintain the Security in the required amount during the Term constitutes a breach of this Lease.

(b)    All Security must be in a form acceptable to the State.

    (1)    Bonds must be issued by companies admitted to do business within the State of Washington and have a rating of A-, Class VII or better, in the most recently published edition of Best's Reports, unless State approves an exception.  Tenant may submit a request to the risk manager for the Department of Natural Resources for an exception to this requirement.

    (2)    Letters of credit, if approved by State, must be irrevocable, allow State to draw funds at will, provide for automatic renewal, and comply with RCW 62A.5-101, *et. seq.*

    (3)    Savings account assignments, if approved by State, must allow State to draw funds at will.

(c)     Adjustment in Amount of Security.
   (1)     State may require an adjustment in the Security amount:
      (i)     At the same time as revaluation of the Annual Rent,
      (ii)    As a condition of approval of assignment or sublease of this Lease,
      (iii)   Upon a material change in the condition or disposition of any Improvements, or
      (iv)    Upon a change in the Permitted Use.
   (2)     Tenant shall deliver a new or modified form of Security to State within thirty (30) days after State has required adjustment of the amount of the Security.
(d)     Upon any default by Tenant in its obligations under this Lease, State may collect on the Security to offset the liability of Tenant to State.  Collection on the Security does not (1) relieve Tenant of liability, (2) limit any of State's other remedies, (3) reinstate or cure the default or (4) prevent termination of the Lease because of the default.

## SECTION 11  ROUTINE MAINTENANCE AND REPAIR

**11.1    State's Repairs.**  This Lease does not obligate State to make any alterations, maintenance, replacements, or repairs in, on, or about the Property, or any part thereof, during the Term.

**11.2    Tenant's Repairs and Maintenance.**
(a)     Routine maintenance and repair are acts intended to prevent a decline, lapse or, cessation of the Permitted Use and associated Improvements. Routine maintenance or repair is the type of work that does not require regulatory permits.
(b)     At Tenant's own expense, Tenant shall keep and maintain the Property and all Improvements in good order and repair and in a safe condition.  State's consent is not required for routine maintenance or repair.
(c)     At Tenant's own expense, Tenant shall make any additions, repairs, alterations, maintenance, replacements, or changes to the Property or to any Improvements on the Property that any public authority may require.  If a public authority requires work beyond the scope of routine maintenance and repair, Tenant shall comply with Section 7 of this Lease.

**11.3    Limitations.**  The following limitations apply whenever Tenant conducts maintenance, repair, or replacement.
(a)     Tenant shall not use or install treated wood at any location above or below water, except that Tenant may use treated wood for above water structural framing.
(b)     Tenant shall not use or install tires (for example, floatation or fenders) at any location above or below water.
(c)     Tenant shall install only floatation material encapsulated in a shell resistant to ultraviolet radiation and abrasion.  The shell must be capable of preventing breakup and loss of flotation material into the water.

(d)    Tenant shall orient night lighting to minimize the amount of light shining directly on the water.

(e)    Tenant shall not allow new floating structures to come in contact with underlying tidelands ("ground out").  Tenant must either (1) locate all new floating structures in water too deep to permit grounding out or (2) install stoppers sufficient to maintain a distance of at least 1.5 feet (0.5 meters) between the bottom of the floats and the substrate.

## SECTION 12  DAMAGE OR DESTRUCTION

**12.1    Notice and Repair.**

(a)    In the event of damage to or destruction of the Property or Improvements, Tenant shall promptly give written notice to State.  State does not have actual knowledge of the damage or destruction without Tenant's written notice.

(b)    Unless otherwise agreed in writing, Tenant shall promptly reconstruct, repair, or replace the Property and Improvements as nearly as possible to its condition immediately prior to the damage or destruction in accordance with Paragraph 7.3, Construction, Major Repair, Modification, and Demolition and Tenant's additional obligations in Exhibit B, if any.

**12.2    State's Waiver of Claim.**  State does not waive any claims for damage or destruction of the Property unless State provides written notice to Tenant of each specific claim waived.

**12.3    Insurance Proceeds.**  Tenant's duty to reconstruct, repair, or replace any damage or destruction of the Property or any Improvements on the Property is not conditioned upon the availability of any insurance proceeds to Tenant from which the cost of repairs may be paid. The Parties shall use insurance proceeds in accordance with Paragraph 10.2(g)(3).

**12.4    Rent in the Event of Damage or Destruction.**  Unless the Parties agree to terminate this Lease, there is no abatement or reduction in rent during such reconstruction, repair, and replacement.

**12.5    Default at the Time of Damage or Destruction.**  If Tenant is in default under the terms of this Lease at the time damage or destruction occurs, State may elect to terminate the Lease and State then shall have the right to retain any insurance proceeds payable as a result of the damage or destruction.

## SECTION 13 CONDEMNATION

**13.1    Definitions.**

(a)    "Taking" means that an entity authorized by law exercises the power of eminent domain, either by judgment, settlement in lieu of judgment, or voluntary conveyance in lieu of formal court proceedings, over all or any portion of the Property and Improvements.  This includes any exercise of eminent domain on



any portion of the Property and Improvements that, in the judgment of the State, prevents or renders impractical the Permitted Use.

(b)     "Date of Taking" means the date upon which title to the Property or a portion of the Property passes to and vests in the condemner or the effective date of any order for possession if issued prior to the date title vests in the condemner.

**13.2   Effect of Taking.**  If there is a taking, the Lease terminates proportionate to the extent of the taking.  If this Lease terminates in whole or in part, Tenant shall make all payments due and attributable to the taken Property up to the date of taking.  If Tenant has pre-paid rent and Tenant is not in default of the Lease, State shall refund Tenant the pro rata share of the pre-paid rent attributable to the period after the date of taking.

**13.3   Allocation of Award.**

(a)     The Parties shall allocate the condemnation award based upon the ratio of the fair market value of (1) Tenant's leasehold estate and Tenant-Owned Improvements and (2) State's interest in the Property; the reversionary interest in Tenant-Owned Improvements, if any; and State-Owned Improvements, if any.

(b)     If Tenant and State are unable to agree on the allocation, the Parties shall submit the dispute to binding arbitration in accordance with the rules of the American Arbitration Association.


## SECTION 14 DEFAULT AND REMEDIES

**14.1   Default Defined.**  Tenant is in default of this Lease on the occurrence of any of the following:

(a)     Failure to pay rent or other expenses when due;

(b)     Failure to comply with any law, regulation, policy, or order of any lawful governmental authority;

(c)     Failure to comply with any other provision of this Lease;

(d)     Commencement of bankruptcy proceedings by or against Tenant or the appointment of a trustee or receiver of Tenant's property.

**14.2   Tenant's Right to Cure.**

(a)     A default becomes an "Event of Default" if Tenant fails to cure the default within the applicable cure period following State's written notice of default.  Upon an Event of Default, State may seek remedies under Paragraph 14.3.

(b)     Unless expressly provided elsewhere in this Lease, the cure period is ten (10) days for failure to pay rent or other monetary defaults; for other defaults, the cure period is thirty (30) days.

(c)     For nonmonetary defaults not capable of cure within sixty (60) days, State will not unreasonably withhold approval of a reasonable alternative cure schedule.  Tenant must submit a cure schedule within thirty (30) days of a notice of default. The default is not an Event of Default if State approves the schedule and Tenant works diligently and in good faith to execute the cure. The default is

an Event of Default if Tenant fails to timely submit a schedule or fails to cure in accordance with an approved schedule.

**14.3    Remedies.**

(a)    Upon an Event of Default, State may terminate this Lease and remove Tenant by summary proceedings or otherwise.

(b)    If the Event of Default (1) arises from Tenant's failure to comply with restrictions on Permitted Use and operations under Paragraph 2.2 or (2) results in damage to natural resources or the Property, State may enter the Property without terminating this Lease to (1) restore the natural resources or Property and charge Tenant restoration costs and/or (2) charge Tenant for damages.  On demand by State, Tenant shall pay all costs and/or damages.

(c)    Without terminating this Lease, State may relet the Property on any terms and conditions as State may decide as appropriate.

(1)    State shall apply rent received by reletting:  (1) to the payment of any indebtedness other than rent due from Tenant to State; (2) to the payment of any cost of such reletting; (3) to the payment of the cost of any alterations and repairs to the Property; and (4) to the payment of rent and leasehold excise tax due and unpaid under this Lease.  State shall hold and apply any balance to Tenant's future rent as it becomes due.

(2)    Tenant is responsible for any deficiency created by the reletting during any month and shall pay the deficiency monthly.

(3)    At any time after reletting, State may elect to terminate this Lease for the previous Event of Default.

(d)    State's reentry or repossession of the Property under Paragraph 14.3 is not an election to terminate this Lease or cause a forfeiture of rents or other charges Tenant is obligated to pay during the balance of the Term, unless (1) State gives Tenant written notice of termination or (2) a legal proceeding decrees termination.

(e)    The remedies specified under this Paragraph 14.3 are not exclusive of any other remedies or means of redress to which the State is lawfully entitled for Tenant's breach or threatened breach of any provision of this Lease.

## SECTION 15  ENTRY BY STATE

State may enter the Property at any reasonable hour to inspect for compliance with the terms of this Lease, to monitor impacts to habitat, or survey habitat and species. Tenant grants State permission to cross Tenant's upland and aquatic land property to access the Property. State shall provide at least 48 hours notice before entering Tenant's property. State's failure to inspect the Property does not constitute a waiver of any rights or remedies under this Lease.

## SECTION 16  DISCLAIMER OF QUIET ENJOYMENT

**16.1    No Guaranty or Warranty.**
   (a)    State believes that this Lease is consistent with the Public Trust Doctrine and that none of the third-party interests identified in Paragraph 1.1(b) will materially or adversely affect Tenant's right of possession and use of the Property, but State makes no guaranty or warranty to that effect.

   (b)    State disclaims and Tenant releases State from any claim for breach of any implied covenant of quiet enjoyment.  This disclaimer and release includes, but is not limited to, interference arising from exercise of rights under the Public Trust Doctrine; Treaty rights held by Indian Tribes; and the general power and authority of State and the United States with respect to aquatic lands and navigable waters.

   (c)    Tenant is responsible for determining the extent of Tenant's right to possession and for defending Tenant's leasehold interest.

**16.2    Eviction by Third-Party.**  If a third-party evicts Tenant, this Lease terminates as of the date of the eviction.  In the event of a partial eviction, Tenant's rent obligations abate as of the date of the partial eviction, in direct proportion to the extent of the eviction; this Lease shall remain in full force and effect in all other respects.

## SECTION 17 NOTICE AND SUBMITTALS

Following are the locations for delivery of notice and submittals required or permitted under this Lease.  Any Party may change the place of delivery upon ten (10) days written notice to the other.

State:       DEPARTMENT OF NATURAL RESOURCES
              Shoreline District
              950 Farman Avenue North
              Enumclaw, WA 98022-9282

Tenant:     TYEE PROPERTIES, LLC
              5618 Marine View Drive
              Tacoma, WA 98422

The Parties may deliver any notice in person, by facsimile machine, or by certified mail. Depending on the method of delivery, notice is effective upon personal delivery, upon receipt of a confirmation report if delivered by facsimile machine, or three (3) days after mailing.  All notices must identify the Lease number.  On notices transmitted by facsimile machine, the Parties shall state the number of pages contained in the notice, including the transmittal page, if any.



## SECTION 18  MISCELLANEOUS

**18.1    Authority.**  Tenant and the person or persons executing this Lease on behalf of Tenant represent that Tenant is qualified to do business in the State of Washington, that Tenant has full right and authority to enter into this Lease, and that each and every person signing on behalf of Tenant is authorized to do so.  Upon State's request, Tenant shall provide evidence satisfactory to State confirming these representations.

**18.2    Successors and Assigns.**  This Lease binds and inures to the benefit of the Parties, their successors, and assigns.

**18.3    Headings.**  The headings used in this Lease are for convenience only and in no way define, limit, or extend the scope of this Lease or the intent of any provision.

**18.4    Entire Agreement.**  This Lease, including the exhibits and addenda, if any, contains the entire agreement of the Parties.  This Lease merges all prior and contemporaneous agreements, promises, representations, and statements relating to this transaction or to the Property.

**18.5    Waiver.**
    (a)    The waiver of any breach or default of any term, covenant, or condition of this Lease is not a waiver of such term, covenant, or condition; of any subsequent breach or default of the same; or of any other term, covenant, or condition of this Lease.  State's acceptance of a rental payment is not a waiver of any preceding or existing breach other than the failure to pay the particular rental payment that was accepted.

    (b)    The renewal of the Lease, extension of the Lease, or the issuance of a new lease to Tenant, does not waive State's ability to pursue any rights or remedies under the Lease.

**18.6    Cumulative Remedies.**  The rights and remedies under this Lease are cumulative and in addition to all other rights and remedies afforded by law or equity or otherwise.

**18.7    Time is of the Essence.**  TIME IS OF THE ESSENCE as to each and every provision of this Lease.

**18.8    Language.**  The word "Tenant" as used in this Lease applies to one or more persons and regardless of gender, as the case may be.  If there is more than one Tenant, their obligations are joint and several.  The word "persons," whenever used, shall include individuals, firms, associations, and corporations. The word "Parties" means State and Tenant in the collective.  The word "Party" means either or both State and Tenant, depending on the context.

**18.9    Invalidity.**  The invalidity, voidness, or illegality of any provision of this Lease does not affect, impair, or invalidate any other provision of this Lease.

**18.10   Applicable Law and Venue.**  This Lease is to be interpreted and construed in accordance with the laws of the State of Washington.  Venue for any action arising out of or in connection with this Lease is in the Superior Court for Thurston County, Washington.

**18.11   Statutory Reference.**  Any reference to a statute means that statute as presently enacted or hereafter amended or superseded.

**18.12   Recordation.**  At Tenant's expense and no later than thirty (30) days after receiving the fully-executed Lease, Tenant shall record this Lease in the county in which the Property is located. Tenant shall include the parcel number of the upland property used in conjunction with the Property, if any. Tenant shall provide State with recording information, including the date of recordation and file number.  If Tenant fails to record this Lease, State may record it and Tenant shall pay the costs of recording upon State's demand.

**18.13   Modification.**  No modification of this Lease is effective unless in writing and signed by both Parties.  Oral representations or statements do not bind either Party.

**18.14   Survival.**  Any obligations of Tenant not fully performed upon termination of this Lease do not cease, but continue as obligations of the Tenant until fully performed.

**18.15 Exhibits.**  All referenced exhibits are incorporated in the Lease unless expressly identified as unincorporated.

THIS AGREEMENT requires the signature of all Parties and is effective on the date of the last signature below.

TYEE PROPERTIES, LLC

Dated: _AUGUST 1_____, 20_13_     _william G. Bradbrooke_

WILLIAM G. BRADBROOKE

Title:   Managing Member

Address:     5618 Marine View Drive
             Tacoma, WA 98422

Phone:       (253) 209-0493


STATE OF WASHINGTON
DEPARTMENT OF NATURAL RESOURCES

Dated: _August 8_____, 20_13_     _Peter Goldmark_

PETER GOLDMARK

Title:   Commissioner of Public Lands

Address:     1111 Washington Street SE
             Olympia, WA 98504


Approved as to form this
12 day of March, 2010
Janis Snoey, Assistant Attorney General

Aquatic Lands Lease                    Page 31 of 36                    Lease No. 20-B11091

REPRESENTATIVE ACKNOWLEDGMENT

STATE OF Washington )
                     ) ss
County of Pierce    )


I certify that I know or have satisfactory evidence that WILLIAM G. BRADBROOKE is the
person who appeared before me, and said person acknowledged that he signed this instrument,
on oath stated that he was authorized to execute the instrument and acknowledged it as the
Managing Member of Tyee Properties, LLC to be the free and voluntary act of such party for the
uses and purposes mentioned in the instrument.

Dated: ___August   1___, 20_13_

(Seal or stamp)

_____
(Signature)

_____
(Print Name)  R. W. MASON

Notary Public in and for the State of
Washington, residing at
_____ TACOMA

My appointment expires ___9-20-16___

STATE ACKNOWLEDGMENT

STATE OF WASHINGTON )
                 ) ss
County of _Thurston_ )

I certify that I know or have satisfactory evidence that PETER GOLDMARK is the person who
appeared before me, and said person acknowledged that he signed this instrument, on oath stated
that he was authorized to execute the instrument and acknowledged it as the Commissioner of
Public Lands, and ex officio administrator of the Department of Natural Resources of the State of
Washington to be the free and voluntary act of such party for the uses and purposes mentioned in
the instrument.

Dated: _____8-8-13_____, 20__

(Seal or stamp)

_____
(Signature)

_____
A. Wagner
(Print Name)

Notary Public in and for the State of
Washington, residing at
_____
Olympia

My appointment expires _9-16-14_

ANDREA WAGNER
COMMISSION EXPIRES
NOTARY
PUBLIC
SEPT. 16, 2014
STATE OF WASHINGTON



# Exhibit A

**Agreement Number  20-B11091**

**Recording number of final DNR approved survey in Pierce County:    200403245001**

**Legal description of the Property:**

THOSE PORTIONS OF THE BEDS OF COMMENCEMENT BAY OWNED BY THE STATE OF WASHINGTON FRONTING ON GOVERNMENT LOT 1, SECTION 21, AND GOVERNMENT LOT 1, SECTION 22, AND BLOCKS 10 AND 11, MAP OF TACOMA TIDELANDS AS SURVEYED AND PLATTED BY THE BOARD OF APPRAISERS OF TIDE AND SHORE LANDS FOR KING COUNTY, ACCORDING TO PLAT FILED JANUARY 12, 1895, AT THE OFFICE OF THE STATE LAND COMMISSIONERS, ALL IN TOWNSHIP 21 NORTH, RANGE 3 EAST, WILLAMETTE MERIDIAN, CITY OF TACOMA, PIERCE COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS: COMMENCING AT THE CONCRETE AND BRASS MONUMENT AT THE NORTHWEST CORNER OF SAID GOVERNMENT LOT 1, SECTION 22; THENCE SOUTH 1°04'30" WEST (CITY OF TACOMA BEARING MERIDIAN), 175.35 FEET ALONG THE WEST LINE OF SAID LOT 1, SECTION 22, TO THE NORTHWEST CORNER OF SAID BLOCK 11, MAP OF TACOMA TIDELANDS; THENCE SOUTH 70°58'08" EAST, 338.12 FEET ALONG THE NORTH LINE OF SAID BLOCK 11; THENCE CONTINUING ALONG SAID NORTH LINE SOUTH 55°34'28" EAST, 248.79 FEET; THENCE SOUTH 51°22'20" WEST 495.00 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 37°38'20" EAST, 89.11 FEET; THENCE SOUTH 51°22'20" WEST, 228.86 FEET; THENCE NORTH 55°52'35" WEST, 94.14 FEET; THENCE SOUTH 51°22'19" WEST, 105.02 FEET; THENCE SOUTH 47°59'49" EAST, 169.77 FEET; THENCE SOUTH 42°00'11" WEST, 75.00 FEET; THENCE NORTH 47°59'49" WEST, 327.00 FEET; THENCE NORTH 71°37'25" WEST, 1357.47 FEET; THENCE NORTH 22°25'00" EAST, 601.14 FEET TO THE LINE OF EXTREME LOW TIDE OF COMMENCEMENT BAY; THENCE SOUTHEASTERLY ALONG SAID LINE TO A POINT WHICH BEARS NORTH 51°22'20" EAST FROM THE POINT OF BEGINNING. THENCE SOUTH 51°22'20" WEST, 195.30 FEET TO THE POINT OF BEGINNING.

CONTAINING 23.46 ACRES, MORE OR LESS

**Square footage of each of these Use classifications:**

| | |
|---|---|
| Water-dependent | 1,021,917.6 |
| Nonwater-dependent | _____ |
| Public Access | _____ |
| **Total square feet** | 1,021,917.6 |



PLAN OF OPERATIONS
EXHIBIT B

**1.    DESCRIPTION OF PERMITTED USE**

**A. Existing Facilities.** The property is used, in conjunction with private tidelands and private uplands, for the purpose of a pleasure boat marina. The marina consists of two floating breakwaters, piers, ramps, floats, covered moorage, pump out facilities and other utilities that support approximately 600 slips. There are no floating homes on the property. The permitted use is water-dependent only for the moorage of recreational vessels and for no other use. In compliance with natural resource restoration along the shoreline of the subject property, all over-water structures [except those structures necessary for access to the lease area] within the shoreline zone, from the line of extreme low water to the -10ft sea elevation at MLLW, have been removed.

**B.    Proposed Facilities.** Tenant proposes no new facilities at this time.

**2.    ADDITIONAL OBLIGATIONS**

(a)    Tenant shall remove the floating structure known as the PC by November 1, 2013. Tenant shall replace the entire existing west barge breakwater identified in Attachment 1 to this Exhibit B with a floating breakwater that meets current design standards, stewardship measures, and all applicable regulatory requirements as required under Section 7.3 and 7.4 of the Lease. Replacement may occur under an ordinary maintenance or repair schedule, but all replacement must be complete by November 1, 2018. Tenant must obtain State's prior written consent for all work as required by Section 7.3(c) of the Lease.

(b)    Tenant shall retain a marine surveyor approved by DNR to conduct an above-water and below-water survey of the ferrocement ship and floating pontoon breakwater in accordance with the scope of work set forth in Attachment 2 to this Exhibit B. If the survey reveals that the useful life of the ferrocement ship and floating pontoon breakwater is less than the term of the lease tenant shall provide a maintenance and repair plan on or before September 1, 2014 that demonstrates how tenant will meet its obligation to maintain the Improvements, including the breakwater, in good repair and safe condition as required under Section 11 of the Lease and begin negotiations with State no later than September 1, 2014 regarding removal of the breakwater. Nothing in this Exhibit B is intended to alter or amend Tenant's obligation to remove Tenant-Owned Improvements, including the ferrocement ship and floating concrete breakwater,

upon termination or expiration of the Lease as required in Section 7.5 or the Lease.

(c)     Tenant shall replace existing tires with inert or encapsulated materials such as plastic or enclosed foam.  Replacement may occur under an ordinary maintenance or repair schedule, but all tires must be replaced by July 1, 2014.

(d)     Tenant shall orient lights affixed to the floating pontoon breakwater identified in Attachment 1 to this Exhibit B to minimize the amount of artificial light shining directly on the water.  Reorientation may occur under an ordinary maintenance or repair schedule, but reorientation must be complete by July 1, 2014.

(e)     Tenant shall remove existing skirting from docks, wharves and piers. Removal may occur under an ordinary maintenance or repair schedule, but removal must be complete by July 1, 2023.

(f)     Tenant shall replace existing unencapsulated floatation materials with encapsulated floatation materials.  Replacement may occur under an ordinary maintenance or repair schedule, but all unencapsulated flotation material must be replaced by July 1, 2023.

(g)     Tenant shall renovate or replace existing docks, rafts, floats, wharves and piers to provide 50 percent grated surface; grating material must have at least 60 percent functional open space.  Replacement may occur under an ordinary maintenance or repair schedule, but replacement must be complete by July 1, 2033.

(h)     Tenant shall replace existing treated wood, (decking, pilings, etc.) with non-toxic materials such as untreated wood, steel, concrete, or recycled plastic, or encased in a manner that prevents leaching of contaminants into surface water. Tenant may use non-creosote treated wood to replace above water structural framing. Replacement may occur under an ordinary maintenance or repair schedule, but all treated wood must be replaced by July 1, 2033.

(i)     Tenant shall remove all existing covered moorage roofs. Removal may occur under an ordinary maintenance or repair schedule, but replacement must be complete by June 30, 2043.



ATTACHMENT 1

Lease No. 20-B11091

Page 1 of 1

# TYEE MARINA DNR LEASE COMMENCEMENT BAY

SECTIONS 21 AND 22, TOWNSHIP 21N, RANGE 3E, W.M.

MATERIALS EXAMINED TO DETERMINE THIS SURVEY INCLUDE
CHICAGO TITLE REPORT ORDER NO. 4223480
1895 TACOMA TIDE LANDS PLAT & 1918 AND 1922 REPLATS (KING COUNTY, WA)
BLA RECORDING NO 200002295003
ROS RECORDING NO. 9003270444
CITY OF TACOMA GIS, DATED OCT 1997

| LINE | BEARING | DISTANCE |
|---|---|---|
| L1 | N86°09'51"W | 53.05 |
| L2 | N67°12'51"W | 800.12 |
| L3 | N75°52'25"W | 563.96 |
| L4 | N75°49'59"W | 339.31 |
| L5 | N52°24'56"W | 130.55 |
| L6 | N51°22'20"E | 175.86 |
| L7 | N42°04'40"W | 182.78' |
| L8 | S59°22'40"E | 234.96 |
| L9 | S76°55'44"E | 180.52 |
| L10 | S82°09'17"E | 89.84 |
| L11 | S75°43'00"E | 190.19 |
| L12 | S72°57'15"E | 99.20 |
| L13 | S66°29'31"E | 119.50 |
| L14 | S69°40'59"E | 108.13 |
| L15 | S68°22'15"E | 150.56' |
| L16 | S69°43'59"E | 148.35' |
| L17 | N65°01'15"W | 62.55' |
| L18 | S71°38'45"E | 260.63' |
| L19 | S22°22'25"W | 43.56' |
| L20 | N86°09'51"W | 8.50' |
| L21 | N01°28'59"E | 378.70' |
| L22 | N55°31'13"W | 104.75' |
| L23 | N53°36'15"W | 181.44' |
| L24 | N78°33'01"W | 487.69' |
| L25 | S78°35'31"E | 22.91' |
| L26 | N66°12'45"W | 36.95' |
| L27 | N70°41'40"W | 319.62' |
| L28 | N51°22'20"E | 123.84' |
| L32 | S00°00'25"W | 39.77 |
| L35 | S53°45'11"E | 474.07 |
| L36 | N52°24'56"W | 513.55 |
| L37 | S51°22'20"W | 158.11 |
| L38 | N42°00'11"E | 75.00 |
| L39 | N51°22'19"E | 105.02' |
| L40 | S66°52'35"E | 94.14 |
| L41 | N51°22'20"E | 228.85 |
| L42 | S37°38'20"E | 89.11 |
| L43 | S51°22'20"W | 195.30 |
| L44 | N47°59'49"W | 169.77 |

| CURVE | RADIUS | DELTA | ARC |
|---|---|---|---|
| C1 | 686.20' | 16°08'29" | 193.32' |
| C2 | 5699.58' | 1°54'58" | 190.61' |
| C3 | 746.20' | 24°56'46" | 324.89' |
| C4 | 924.93 | 12°22'47" | 199.85' |
| C5 | 1462.40' | 4°27'43" | 113.80' |

LEGEND

- FOUND MONUMENT AS NOTED
- SET 5/8" BAR & CAP LS#11278
- FOUND SURVEY MARKER
- OHW APPROXIMATE ORDINARY HIGH WATER MARK
- FLOATING BOAT SLIPS
- GOVERNMENT MEANDER LINE

THIS SURVEY WAS PERFORMED WITH A NIKON DTM-520 ELECTRONIC THEODOLITE READING DIRECT TO 3 SECONDS OF ARC AND MEASURING DISTANCE +/- (2+(2PPM*D))MM. NGS BASELINE COMPARED JULY 2001. THIS SURVEY MEETS THE MINIMUM STANDARDS SET FORTH IN WAC 332-130.

AQUATICS LEASE APP. NO. 20-A11091

VERTICAL DATUM CITY OF TACOMA BENCHMARK EL. 31.091; DRIVEWAY #5118 MARINE VIEW DR. CONVERSION FACTOR -7.5 FOR MLLW

BEARING MERIDIAN AND PLANIMETRY ARE FROM CITY OF TACOMA G.I.S. MAPPING DATED OCTOBER 1997. (CITY OF TACOMA COORDINATES SHOWN)

VERTICAL DATUM (MLLW) WAS CONVERTED FROM CITY OF TACOMA DATUM AND CHECKED AGAINST PREDICTED TIDES 0.5.

## SURVEYOR'S CERTIFICATE

THIS MAP CORRECTLY REPRESENTS A SURVEY MADE BY ME OR UNDER MY DIRECTION IN CONFORMANCE WITH THE REQUIREMENTS OF THE SURVEY RECORDING ACT AT THE REQUEST OF TYEE MARINA IN MAY 2001

DAVID A. BERG, P.L.S NO 11278
D.A.BERG INC.
811 S. 80TH STREET
TACOMA, WA. 98408
(253)474-3208

24 MAY 04

## AUDITOR'S CERTIFICATE

FILED FOR RECORD THIS 24 DAY OF March 2004
AT 9:17 A.M. #85.00
UNDER FILE NO. 200403245001
AUDITOR DEPUTY

original

| DNR LEASE | |
|---|---|
| PREPARED BY: D.A.BERG INC. 811 S. 80TH STREET TACOMA, WA. 98408 (253)474-3208 FILE: 8912.0132 DATE: 6 DEC 2001 | PREPARED FOR: TYEE MARINA 5618 MARINE VIEW DR. TACOMA, WA. 98422 |

REV. 02MAR04 BREAKWATER
REV. 22DEC03 DRAFTING

200403245001

Aquatic Lands Lease



**MOFFATT & NICHOL**

600 University Street
Suite 610
Seattle, Washington 98101
**(206) 622-0222**
Fax (206) 622-4764

February 15, 2013

Mr. Pat Mathews
**Tyee Marina**
**5618 Marine View Drive**
**Tacoma, WA  98422**

Subject:    Tyee Marina Floating Breakwater Investigation
            Proposal for Professional Services

Dear Mr. Mathews,

Tyee Marina contacted Moffatt & Nichol (M&N) to investigate your outboard floating breakwater and to provide an opinion of its remaining service life. The opinion of remaining service life will support the Marina's efforts to renew your lease with the Department of Natural Resources (DNR) and the application for financing. M&N proposes to provide professional services to the Tyee Marina for the investigation of the outboard floating breakwater. The findings from the field investigation will be summarized in a letter report.

Enclosed for your convenience are two copies or our standard Professional Service Agreement which includes the detailed Statement of Services. We propose to perform the work on a time and materials reimbursable basis for an amount not to exceed $53,034. This proposal is based on our understanding of your requirements and our visit to the site on February 8, 2013.

We anticipate that six days in the field are required to complete the above- and below-water investigation. This includes one day for the topside surface investigation and opening hatches; two days for the interior chamber and hold investigation; and three days for the underwater investigation. Summarizing the field data in a letter report will require approximately two weeks from completion of the field effort. The field investigation could commence three weeks after a professional service agreement is in place between Tyee Marina and M&N.

If you agree with the Terms and Conditions of the enclosed Professional Service Agreement, please sign and send both copies back to M&N along with an initial payment of $16,000. Please note that this proposal is valid for 30 days from the date of this letter.

It is our understanding that the findings from the recent breakwater anchor inspection are available. This would be a useful report to reference in our efforts and we understand that you will provide us a copy upon acceptance of this proposal.

Please call Byron Haley or me if you have questions and/or want to discuss any part of this proposal.  We look forward to working with you on this important project.

Sincerely,
**MOFFATT & NICHOL**

Thomas J. McCollough, PE
Vice President and Branch Manager

Enclosure:    Professional Service Agreement

Attachment 2

# AGREEMENT BETWEEN CLIENT AND ENGINEER
# FOR PROFESSIONAL SERVICES

THIS AGREEMENT is made on the _____ day of _____, 2013, by and between, Tyee Marina hereinafter called CLIENT, and Moffatt & Nichol, hereinafter called ENGINEER, for the following Project (the "Project"):

Tyee Marina Floating Breakwater Investigation _____

The CLIENT and ENGINEER for mutual consideration agree as set forth below:

## 1.0   ENGINEER'S SERVICES

The ENGINEER shall perform professional services in connection with the Project, as set forth below, and as may be further described in Exhibit "A".

See Exhibit A _____

_____

## 2.0   ENGINEER'S CHARGES

In accordance with this Agreement, the ENGINEER shall provide professional services for which the CLIENT shall compensate Engineer and the total compensation shall not exceed the dollar amount indicated herein, and as may be further described in Exhibit "B".

☐ PERCENT COMPLETE.   Compensation for these services shall be $_____, to be invoiced on a percent complete basis.

☒ TIME AND MATERIALS.   Compensation for these services will not exceed $53,034 without written authorization.

CLIENT agrees to provide payment of $16,000 prior to ENGINEER beginning work on the Project.

## 3.0   INSURANCE AND LIABILITY PROVISIONS

3.1   The ENGINEER shall acquire and maintain statutory workmen's compensation insurance coverage, employer's liability, comprehensive general liability insurance coverage and professional liability insurance coverage.

3.2   The CLIENT agrees to limit the ENGINEER's liability to the CLIENT and to all Construction Contractors and Subcontractors on the Project, due to the ENGINEER's professional negligent acts, errors or omissions, such that the total aggregate liability of the ENGINEER to those named shall not exceed the ENGINEER's total fee for services rendered on this Project.

## 4.0   CLIENT'S RESPONSIBILITY

The CLIENT shall, unless otherwise provided for in this Agreement, at no cost to the ENGINEER:

4.1   Furnish to the ENGINEER all survey and all soils data, as well as other Project documentation as may be requested by ENGINEER, and upon which ENGINEER may reasonably rely.

4.2   The ENGINEER makes no representations concerning soil conditions and is not responsible for any liability that may arise out of the performance or failure to perform soils investigations and testing.

4.3   Guarantee full and free access for the ENGINEER to enter upon all property required for the performance of the ENGINEER's services.

4.4   Give prompt written notice to the ENGINEER whenever the CLIENT observes or otherwise becomes aware of any defect in the Project or other event which may substantially affect the ENGINEER's performance of services under this Agreement.

**5.0    REIMBURSABLE EXPENSES**

Reimbursable Expenses are in addition to ENGINEER's compensation for services performed on an Hourly Rate basis and include expenditures made by the ENGINEER, his employees or his consultants in the interest of the Project.

**6.0    PAYMENTS TO THE ENGINEER**

6.1    Progress payments shall be made in proportion to services rendered or as otherwise indicated within this Agreement and shall be due and owing upon the ENGINEER's submittal of any invoice.  Past due amounts owed shall include a late payment Finance Charge which will be computed at the periodic rate of 1% per month, which is an Annual Percentage Rate of 12%, and will be applied to any unpaid balance 30 days after the date of the original invoice.

6.2    The ENGINEER may, upon seven days written notice, suspend services if CLIENT fails to make payments.

6.3    No deductions shall be made from the ENGINEER's compensation on account of penalty or other sums withheld from payments to Contractors.

6.4    Hourly Rates and Reimbursable Expenses shall be subject to periodic revision as stated on the Rate Schedule.  In the event revisions are made during the lifetime of this Agreement, the increased or decreased Hourly Rates and Reimbursable Expenses shall apply to all remaining compensation for services performed by the ENGINEER when such rates provide the basis for the ENGINEER's compensation.

6.5    If the Project is delayed or if the ENGINEER's services for the Project are delayed or suspended for more than three months for reasons beyond the ENGINEER's control, the ENGINEER may, after giving seven days written notice to the CLIENT, terminate this Agreement and the CLIENT shall compensate the ENGINEER in accordance with the termination provision contained hereinafter in this Agreement.

**7.0    GENERAL PROVISIONS**

7.1    All Drawings, Specifications and other work data of the ENGINEER for this Project are instruments of service for this Project only and shall remain the property of the ENGINEER whether the Project is completed or not.  The CLIENT shall not reuse any of the ENGINEER's instruments of service on extensions of this Project or on any other project without the prior written permission of the ENGINEER.  Any unauthorized reuse shall be at the CLIENT's risk and the CLIENT agrees to defend, indemnify and hold harmless the ENGINEER from all claims, damages, and expenses including attorney's fees arising out of such unauthorized reuse of the ENGINEER's instruments of service by the CLIENT OR BY OTHERS ACTING THROUGH THE CLIENT.

7.2    Neither the CLIENT nor the ENGINEER shall delegate his duties under this Agreement without the written consent of the other.

7.3    This Agreement may be terminated by either party by seven days written notice in the event of substantial failure to perform in accordance with the terms of this Agreement by the other party through no fault of the terminating party.  If this Agreement is terminated, the ENGINEER shall be paid for services performed to the termination notice date including Reimbursable Expenses due plus Termination Expenses.    Termination Expenses are defined as Reimbursable Expenses directly attributable to termination.

7.4    This Agreement represents the entire and integrated agreement between the CLIENT and the ENGINEER and supersedes all prior negotiations, representations or agreements, either written or oral.  This Agreement may be amended only by written instrument signed by both the CLIENT and the ENGINEER.

7.5     Any dispute or claim arising out of this Agreement shall be determined as follows:  CLIENT and ENGINEER will negotiate in good faith to reach agreement.  If negotiations are unsuccessful, ENGINEER and CLIENT agree the dispute shall be settled by mediation.  In the event the dispute or any issues remain unresolved, the disagreement shall be decided by such remedies of law as they are available to the parties.  This Agreement shall be governed by the laws of the State of California.

7.6     Should litigation occur between the two parties relating to the provisions of this Agreement, all litigation expenses, collection expenses, witness fees, court costs and attorney's fees incurred by the prevailing party shall be paid by the non-prevailing party to the prevailing party.

7.7     Neither Party shall hold the other responsible for damages or delay in performance caused by acts of God, strikes, lockouts, accidents, or other events beyond the control of the other or the other's employees and agents.

7.8     In the event any provisions of this Agreement shall be held to be invalid and unenforceable, the remaining provisions shall be valid and binding upon the parties.  One or more waivers by either party of any provision, term, condition or covenant shall not be construed by the other party as a waiver of a subsequent breach of the same by the other party.

7.9     The ENGINEER is not responsible for design and construction review services relating to the Contractor's safety precautions or to means, methods, techniques, sequences, or procedures required for the Contractor to perform his work.  Omitted services include but are not limited to shoring, scaffolding, underpinning temporary retainment of excavations and any erection methods and temporary bracing.

7.10    The ENGINEER intends to render his services under this Agreement in accordance with generally accepted professional practices for the intended use of the Project and makes no warranty either express or implied.

7.11    Any estimate of construction costs prepared by the ENGINEER represents his judgment as a design professional and is supplied for the general guidance of the CLIENT.  Since the ENGINEER has no control over the cost of labor and material, or over competitive bidding or market conditions, the ENGINEER does not guarantee the accuracy of such estimates as compared to Contractor bids or actual cost to the CLIENT.

## 8.0    NOTICES

Any notices required to be given under this Agreement may be given by enclosing the same in a sealed envelope, postage prepaid, addressed as follows:

| CLIENT: | | Tyee Marina |
| | | 5618 Marine View Drive |
| | | Tacoma, WA 98422 |
| | Attention: | Pat Mathews |
| ENGINEER: | | Moffatt & Nichol |
| | | 600 University St, Suite 610 |
| | | Seattle, WA 98101 |
| | Attention: | Tom McCollough |

Notices shall be deposited in the U.S. Postal Service.  When so given, such notice shall be given from the time of mailing the same.

Attachment 2

       IN WITNESS WHEREOF, the parties hereto have executed this Agreement which is in effect as of the day and year first above written when signed by both parties.

**Moffatt & Nichol**

ENGINEER

By: _____

Name:   Thomas J. McCollough

Title:     Vice President

Date: _____

**Tyee Marina**

CLIENT

By: _____

Name: _____

Title: _____

Date: _____

Attachment 2
**EXHIBIT "A"**

**TYEE MARINA**
**FLOATING BREAKWATER INVESTIGATION**
**STATEMENT OF SERVICES**

**BACKGROUND**

Tyee Marina contacted Moffatt & Nichol (M&N) to investigate their outboard floating breakwater and to provide an opinion of the remaining service life. The opinion of remaining service life will be used to support the Marina's efforts in renewing their lease with the Department of Natural Resources (DNR) and support the Marina's application for financing.

M&N visited Tyee Marina on February 8, 2013 to view the facility and gain an understanding of the scope of work. The outboard floating breakwater consists of four concrete floating bridge pontoons and a decommissioned World War II (WWII) ferrocement ship. The pontoons were originally constructed for the I-90 floating bridge in 1940. In 1990, a portion of the floating bridge sank and a few of the pontoons were salvaged and rehabilitated for use as a breakwater. No information is available on the WWII era ferrocement ship.

**SCOPE OF WORK**

The scope of work includes an above- and below-water investigation of the breakwater and a letter report summarizing our findings. The limits of the investigation are as follows:

- (3) 320-foot long by 55-foot wide concrete floating bridge pontoons
- (1) 320-foot long by 30-foot wide concrete floating bridge pontoon
- (1) 365-foot long by 55 –foot wide WWII ferrocement ship
- The investigation will be limited to the structural integrity of the pontoon's concrete chamber envelopes and the ship's ferrocement hold envelope. The anchors and associated chains, electrical utilities, fenders, and all other appurtenances will not be included in the investigation.

**A.  Field Investigation**

The field investigation will include an above- and below-water investigation. Prior to mobilization, a field work plan will be developed and will be accompanied by a Job Safety Analysis (JSA). The field work plan includes the logistics of mobilizing equipment and personnel to the project site and developing a tailored work plan to meet the specific requirements of this assignment. The JSA defines the diving objectives and physical environment to determine if there are any potential hazards that must be mitigated. Possible hazards include debris, currents, severe tidal conditions, heat, cold, differential pressure and difficult access conditions. Potential hazard mitigation measures are incorporated into the field work plan. The JSA will identify all emergency contacts in the region.

The methodology of these investigations is described below:

Attachment 2
## EXHIBIT "A" (Continued)

1. **Above-Water Investigation:**
The above-water investigation will include the topside surface and the readily accessible interior chambers and holds of the breakwater. The topside surface investigation will be conducted using a 2-person crew by walking the deck. The WWII ship is only accessible by boat. The exterior sides of the breakwater will be investigated from a boat.

The interior chambers and holds of the breakwater will be investigated by entering though the topside access hatches. Any chambers or holds that are not accessible due to seized-shut hatches will not be investigated. Water and gravel ballast are likely to be found in the bottom of the breakwater; water will not be pumped out and ballast will not be removed for this investigation.

The chambers and holds are considered confined space per the Occupational Safety and Health Administration (OSHA). The investigation procedures and crew size will be in accordance with OSHA-approved safety standards. A 4-person crew will be used, including two authorized entrants, one attendant, and one entry supervisor. It is anticipated that we will open all functional hatches during the topside surface investigation, preferably a few days before entering the chambers and holds to let them air out. The air will be tested using a 4-gas meter after free-ventilating. If the desired air quality is not met, a blower will be used to ventilate the air, and if required Self-Contained Breathing Apparatus (SCBA) will be used.

The investigation will be limited to the concrete envelopes of the breakwater. Observed concrete deterioration, such as cracks and spalls, will be noted. The extent of delamination associated with corrosion spalling of reinforced concrete elements will be determined by sounding the area adjacent to the spall in order to understand the extent of deterioration. If corrosion spalling with exposed reinforcing steel is encountered, an estimate of the remaining cross section of the steel reinforcing will be made.

The above-water investigation will also include locating the access hatches on a plan view of the breakwater and developing a unique identification for each access hatch.

2. **Underwater Investigation:**
The underwater investigation will include the submerged concrete envelope of the breakwater. M&N's engineer-divers will perform the underwater investigation with Surfaced Supplied Air (SSA) equipment in accordance with OSHA-approved safety standards. The underwater investigation will be conducted from a boat using a three-person SSA dive crew.

The underwater investigation will be performed in accordance with ASCE Manuals and Reports on Engineering Practice Number 101, titled "Underwater Investigations Standard Practice Manual", 2001 Edition (ASCE 101). ASCE 101 describes the types of inspections and specific structure considerations depending on objectives, frequency of inspection and the level of damage. Three basic levels of inspection are used for

## EXHIBIT "A" (Continued)

inspecting marine facilities. The type and extent of damage/deterioration that can be detected depends on the level of inspection performed. The following general descriptions for Levels I through III comply with the ASCE 101.

a. **Level I -** Visual or tactile inspection of underwater components without the removal of marine growth.  This level of investigation generally serves as a confirmation of as-built conditions and detects obvious damage or deterioration to the structure.

b. **Level II -** Partial marine growth removal of a statistically representative sample – for large elements such as the flat bottom of a concrete breakwater, this is typically one-square foot areas at the outboard edge, center, and inboard edge every 100 linear feet along all accessible submerged components.  This level of investigation is intended to detect and identify damage and deterioration that may be hidden by surface biofouling.

c. **Level III -** Nondestructive testing (NDT) or partially destructive testing (PDT) of a statistically representative sample. These procedures are conducted to detect any hidden internal damage or deterioration. Level III investigations will not be conducted as part of this scope of work.

We propose a Level I and Level II investigation of the breakwater. This includes a visual and tactile examination of 100-percent of the underwater breakwater envelope and partial marine growth removal at 100-foot intervals along the breakwater. Note that marine growth will likely cover a large portion of the float and therefore only major damage will be observed during a Level I investigation. Photographs will be taken of typical conditions and typical observed damage.

## B.  Field Investigation Report

The results of the field investigation will be summarized in a letter report. The field data will be used to develop an opinion of the remaining service life of the breakwater in its rehabilitated use. The field investigation report will include the following:

1. A description of the breakwater
2. A summary of the observations noted during the field investigation including photographs of typical conditions of the components and major areas of concern. The observations noted during the field investigation will be summarized in tabular format.
3. An opinion of the remaining service life of the breakwater in its rehabilitated use.
4. A not-to-scale plan view of the breakwater with access hatches approximately located and identified.

Drawings showing typical breakwater sections and defect locations will not be provided.

Attachment 2

**EXHIBIT "A" (Continued)**

**ASSUMPTIONS**

- Record and/or as-built drawings of the breakwater are not available.
- No contaminated materials will be found on-site.
- The breakwater will be fully accessible to M&N Monday through Sunday of any given week.
- An opinion of probable construction costs to repair the breakwater based on the investigation will not be included in the report.
- Our inspection boat can be safely and securely moored overnight at the marina at no cost to M&N.
- Tyee Marina is the owner of the floating breakwater including the floating bridge pontoons and the ferrocement ship.

Attachment 2
## EXHIBIT "B"

**TYEE MARINA**
**FLOATING BREAKWATER INVESTIGATION**
**COMPENSATION AND PAYMENT**

## COMPENSATION AND PAYMENT

We propose to perform this work on a time and materials basis for a not to exceed fee of $53,034. A breakdown of our fee by task is provided below. Our standard unit rates for labor, equipment, and expenses are attached. These rates are valid until the end of 2013.

| Task Description | Total |
|---|---|
| Project Management & QA/QC | $2,748 |
| Mobilization & Demobilization | $5,312 |
| Above-Water Investigation | $14,824 |
| Underwater Investigation | $13,644 |
| Field Investigation Report | $9,488 |
| Equipment | $5,133 |
| Lodging, Meals, Incidentals | $1,885 |
| **TOTAL** | **$53,034** |

A 30-percent initial payment to M&N is required upon receipt of the signed agreement in the amount of $16,000 before the field investigation planning commences. The remainder of the fee will be invoiced at the completion of the work.

Attachment 2



# INSPECTION BILLING RATE SCHEDULE
### Effective January 2012 Until Revised

Page 1 of 3

| PERSONNEL TITLE | M&N GRADE | HOURLY RATE * |
|---|---|---|
| Principal Engineer/Scientist | P8,P9 | $240.00 |
| Supervisory Engineer | P7 | $215.00 |
| Supervisory Engineer-Diver | P7 | $227.50 |
| Senior Engineer | P6 | $197.00 |
| Senior Engineer-Diver | P6 | $209.50 |
| Engineer III | P5 | $185.00 |
| Engineer-Diver III | P5 | $197.50 |
| Engineer II | P4 | $164.00 |
| Engineer-Diver II | P4 | $176.50 |
| Engineer I | P3 | $143.00 |
| Engineer-Diver I | P3 | $155.50 |
| Staff Engineer | P1,P2 | $114.00 |
| Staff Engineer-Diver | P1,P2 | $126.50 |
| Senior Technician | T5 | $158.00 |
| Senior Technician-Diver | T5 | $170.50 |
| CADD II | T3 | $121.00 |
| CADD I | T1,T2 | $92.00 |
| Word Processor | A3,A4 | $92.00 |
| General Clerical | A1,A2 | $74.00 |

\* Non-Diver rates have not changed from April 2010 Rate Schedule.
\* Diver rates (shaded lines) are based on extra $100 per 8-hour day.

| Typical Dive Crew Rates, with Equipment | DAILY RATES [2-5] | | WEEKLY RATES [6,7] | |
|---|---|---|---|---|
| | (Initial Day) | (Add'l Days) | (Initial Wk) | (Add'l Wks) |
| SCUBA Dive Team - 3 Man Crew (P6,P5,P3)   [NOTE: 4-man is standard & recommended; Tether & Hard-Wired Comms required with 3-man Scuba crew.] | $6,437.00 | $5,411.00 | $27,606.00 | $26,580.00 |
| SCUBA Dive Team - 4 Man Crew (P6,P5,P5,P3) | $8,142.00 | $7,116.00 | $36,046.00 | $35,020.00 |
| SSA Dive Team - 3 Man Crew (P6,P5,P3)  [NOTE: 4-man is standard & recommended; 3-man SSA crew may only be used under approved special conditions.] | $7,964.00 | $5,340.00 | $28,534.00 | $25,910.00 |
| SSA Dive Team - 4 Man Crew [min size, Hazardous Diving] (P6,P5,P5,P3) | $9,644.00 | $7,020.00 | $36,834.00 | $34,210.00 |
| SSA Dive Team - 5 Man Crew (P6,P5,P5,P3,P3) | $10,973.00 | $8,349.00 | $43,394.00 | $40,770.00 |

| Typical Field Crew Rates [8], with Equipment | DAILY RATES [2-5] | | WEEKLY RATES [6,7] | |
|---|---|---|---|---|
| | (Initial Day) | (Add'l Days) | (Initial Wk) | (Add'l Wks) |
| Topside Investigation - 1 Man Crew (P6) | $1,691.00 | $1,691.00 | $8,340.00 | $8,340.00 |
| Topside Investigation - 2 Man Crew (P5,P5) | $3,141.00 | $2,855.00 | $15,590.00 | $14,160.00 |
| Topside Investigation - 3 Man Crew (P6,P5,P3) | $4,621.00 | $4,335.00 | $22,990.00 | $21,560.00 |
| Above Water Investigation - 2 Man Crew with Small Boat (P5,P5) | $3,983.00 | $3,243.00 | $19,660.00 | $15,960.00 |
| Above Water Investigation - 3 Man Crew with Small Boat (P5,P5,P3) | $5,043.00 | $4,387.00 | $24,960.00 | $21,680.00 |

## NOTES
1. Crew Rates shown are for typical personnel (as indicated above) & equipment. Manhours & equipment included are shown on separate crew detail sheets; modify crew makeup/hours & equipment if/as necessary.
2. Daily Rates assume 8-hour days and typical crew personnel & equipment. Initial Day rates include time for document preparation, mobilization and demobilization, etc. See details on appropriate Team/Crew worksheets.
3. Additional manhours and costs may apply for projects with significant requirements for research, planning, document prep, or logistics, or for mobilization/demobilization involving remote sites &/or long distances, or for use of specialized inspection/testing equipment, etc.
4. The above rates are for the field effort only. Per diem and travel expenses are additional costs.
5. Additional costs apply for office manhours to compile field notes, review/edit photos, write reports, etc.
6. For jobs longer than 4 days, use Weekly Equip Rates (generally,1 week rate = 4 x daily rate; see details). For extended jobs with one or more partial weeks use daily rates, not partial weekly rates, for the partial weeks.
7. Weekly Labor rates assume 1 week = 5 working days, 8 hours per day.
8. If above water & topside investigations are performed by an on-site dive crew, typically two men will do the above water work with a boat and the remainder will do topside. Assume above water & topside personnel accordingly, but use non-Diver rates to set crew rate.

Apr 2012

Attachment 2



**INSPECTION BILLING RATE SCHEDULE**                                Page 2 of 3
**Effective January 2012 Until Revised**

| Diving Equipment | DAILY RATE | WEEKLY RATE |
|---|---|---|
| Surface-Supplied Air Diving Station - 3 man crew<br>Diving Helmets &/or Full-Face Masks (minimum total 2), Control Station, Hardwire Communications, Low Pressure (LP) Compressor &/or Breathing Air K-Bottles, Volume Tank(s), Umbilicals, Wet and/or Dry Suits, U/W Dive Lights, Weights, Bailout Bottles & Harnesses, Backboard, Medical Kit, O2 Kit, and Peripherals | $425.00 | $1,700.00 |
| Surface-Supplied Air Diving Station - 4 or 5 man crew<br>Same as 3-man SSA crew above, but with minimum of <u>three</u> Diving Helmets &/or Full-Face Masks (and all associated additional gear and peripherals), capable of supporting  2 divers at the same time. | $525.00 | $2,100.00 |
| Scuba Dive Station - 4 man crew<br>Minimum three complete Scuba setups including Buoyancy Compensators, Air Cylinders (typ. 7 ea, 80-100 cf), Wet and/or Dry Suits, Weights, Masks, Regulators,  Secondary Air Sources (typ. 30-50 cf cylinders with regulators), Safety Lines, UW Dive Lights, Backboard, Medical Kit, O2 Kit, and Peripherals | $285.00 | $1,140.00 |
| Scuba Dive Station - 4 man crew with Hard-Wire Comms added:<br>Same as 4-man Scuba crew above, but with all appropriate gear to maintain hard-wired communications from Diver(s) to Supervisor. | $350.00 | $1,400.00 |
| Scuba Dive Station - 3 man crew   [*Not recommended. Not for EM-385*]<br>Harness/Tether System & Hard-Wire Comms REQUIRED.<br>Otherwise, same as 4-man Scuba crew above, but minimum <u>two</u> complete Scuba setups instead of 3, with all assoc'd gear & peripherals. | $285.00 | $1,140.00 |
| High Pressure (HP) Compressor | $145.00 | $580.00 |
| Recompression Chamber and Associated Peripherals (5-day minimum) | ----- | $6,900.00 |
| Consumables - Diving<br>   Batteries, Gloves, Air Fills, Compressor Filters/Fuel/Oil, Generator, Fuel/Oil, Ropes/Lines, Hand Tools for Underwater Use, etc. | $50.00 | $250.00 |
| Breathing Air Cylinder Rental | $20.00 | $100.00 |
| **Non-Destructive & Partially Destructive Testing Equip't** | DAILY RATE | WEEKLY RATE |
| Bathycorrometer | $150.00 | $600.00 |
| Ultrasonic thickness Meter | $75.00 | $300.00 |
| Electronic Depth Sounder with Transducer | $25.00 | $100.00 |
| Fathometer, Recording (3-day minimum) | $200.00 | $800.00 |
| Differential GPS unit | $200.00 | $800.00 |
| Dissolved Oxygen Testing Equipment | $150.00 | $600.00 |
| Electric Concrete Core Drill Package (Above Water only)<br>Drill & assoc'd Stand, Pumps, etc.; 1 ea 2" & 4" ID Bits (add'l for Gen'r) | $200.00 | $800.00 |
| Hydraulic Concrete Coring Package (Underwater or Above Water)<br>Hydraulic Power Pack, 200LF Hose, Drill & assoc'd, 1 ea 2" & 4" ID Bits | $350.00 | $1,400.00 |
| Add'l Concrete Coring Bits (typ. use one each 2" & 4" bit on each project):<br>2" ID core drill bit (chloride sampling) | $185.00 | each |
| 4" ID core drill bit (transport properties, petrographic, compressive strength tests) | $335.00 | each |
| Hydraulic Timber Coring Package (Underwater or Above Water)<br>Hydraulic Power Pack, 200LF Hose, Drill & assoc'd, 2" ID Bits | $285.00 | $1,140.00 |
| Pachometer or other Embedded Steel Locator | $90.00 | $360.00 |
| Schmidt Hammer | $35.00 | $140.00 |

Attachment 2



### INSPECTION BILLING RATE SCHEDULE
**Effective January 2012 Until Revised**

moffatt & nichol

Page 3 of 3

| Boats & Vehicles | DAILY RATE | WEEKLY RATE |
|---|---|---|
| 25 to 30-ft Dive Vessel (additional for fuel) | $660.00 | $2,640.00 |
| 25 to 30-ft Dive Vessel with fuel (assume 10 gal/day x $4) | $700.00 | $2,840.00 |
| 17 to 24-ft Dive Boat (additional for fuel) | $330.00 | $1,320.00 |
| 17 to 24-ft Dive Boat with fuel (assume 8 gal/day x $4) | $362.00 | $1,480.00 |
| 12 to 16-ft Inspection Boat with Motor (additional for fuel) | $175.00 | $700.00 |
| 12 to 16-ft Inspection Boat with fuel (assume 5 gal/day x $4) | $195.00 | $800.00 |
| Up to 11-ft Inspection Boat with Outboard Motor (additional for fuel) | $115.00 | $460.00 |
| Up to 11-ft Inspection Boat with Motor and Fuel (assume 2 gal/day x $4) | $123.00 | $500.00 |
| Dive Van/Truck (additional for fuel, plus $0.75 per mile) | $110.00 | $440.00 |
| Support Vehicle - Light Truck, SUV (add'l for fuel, plus $ per mile at Fed'l rate) | $85.00 | $340.00 |
| **Tools & Miscellaneous** | **DAILY RATE** | **WEEKLY RATE** |
| Consumables - Topside / Above Water. Batteries, hammers, flashlights, etc. | $20.00 | $100.00 |
| Generator - Lightweight Portable 2.5 kw or similar | $40.00 | $160.00 |
| Light Duty Airlift excavator Unit | $35.00 | $140.00 |
| Hydraulic Tools - Drill, Saw, Impact Wrench, etc *[Drill incl. in Coring Pkg $]* | $85.00 | $340.00 |
| Hydraulic Power Pack (up to 10 GPM @ 2000psi) with hydraulic hose (up to 200-ft length).  *[Pwr Pack & Hose included in Hydraulic Coring Pkg $]* | $150.00 | $600.00 |
| Concrete Percussion Drill (e.g., to mount corer to side/bottom surfaces, etc.) | $35.00 | $140.00 |
| Compressor For Pneumatic & Dive Support Operations (up to 50CFM) | $70.00 | $280.00 |
| Confined Space Equipment: 4-Gas Meter; Tripod/Winch; (2) SCBAs (Self Contained Breathing Apparatus); (4) 30-minute Air Cylinders for SCBAs | $250.00 | $1,000.00 |
| 4-Gas Meter | $35.00 | $140.00 |
| **Documentation Equipment** | **DAILY RATE** | **WEEKLY RATE** |
| Above water Digital Camera | $30.00 | $120.00 |
| Underwater Digital Still Camera System | $50.00 | $200.00 |
| Underwater Digital Still Camera System with Clearwater Box | $80.00 | $320.00 |
| Underwater & Above Water GoPro HD Digital Video System in Housing | $75.00 | $300.00 |
| Underwater CCTV Video System w/ Topside Monitor, Digital Video Recorder | $290.00 | $1,160.00 |
| **Coastal/Environmental Data Acquisition Equipment** | **DAILY RATE** | **WEEKLY RATE** |
| RDI ADCP | $120.00 | $480.00 |
| Interocean S4 ADW | $100.00 | $400.00 |
| Aanderaa | $140.00 | $560.00 |
| Leica DGPS | $40.00 | $160.00 |
| Brancker Tide Gage TG-205 | $20.00 | $80.00 |
| Edgetech Acoustic Release | $30.00 | $120.00 |
| Edgetech Deck Unit | $50.00 | $200.00 |
| Brancker Tide Gage DR-1050 | $10.00 | $40.00 |
| Non-Dir Wave Gage | $50.00 | $200.00 |
| Popup Buoy | $10.00 | $40.00 |
| USGS suspended Sediment Sampler | $75.00 | $300.00 |
| Avon | $10.00 | $40.00 |
| 2.5 hp outboard | $10.00 | $40.00 |
| Horizontal RDI ADCP | $150.00 | $600.00 |
| Turbidity Meter | $10.00 | $40.00 |
| YSI Water Quality Analyzer | $25.00 | $100.00 |

Exhibit C



YOKWALA BEACH

STORAGE

PARKING LOT

MARINE VIEW DR - SR 509

PARKING LOT

OFFICE

SHORELINE

MLLW = 0.0

EXTREME LOW WATER

TYEE MARINA

SITE PLAN
RE: CHB    2022 12.14    1/1

0   50'   100'        200'        300'

COMMENCEMENT BAY

FLOATING BREAKWATER

'Y' PONTOON

LOWER DECK
STORAGE AREA

'RUSTY ROOF' SHED

Exhibit D



**201 4TH STREET, SUITE 102**
**OAKLAND, CALIFORNIA 94607**
**TELEPHONE 510.658.0702**

November 9, 2023

Citizen Suit Coordinator
United States Department of Justice
Environment & Natural Resources Division
Law and Policy Section
P.O. Box 7415
Washington, D.C. 20044-7415

<u>Re: Communities for a Healthy Bay v. Tyee Marina, LLC, et al. (W.D. Wash. Case No. 3:23-
cv-05432-TMC)</u>

Dear Citizen Suit Coordinator,

This letter is intended to provide assurance that I have received the final or near-final
version of the proposed Consent Decree between Communities for a Healthy Bay and Tyee
Marina, LLC, et al. (Tyee) and that I am authorized by my Board of Directors to make the
following binding commitments on behalf of the Rose Foundation.

1) I understand that the Rose Foundation should receive funds from Tyee as specified
   in the Consent Decree.
2) The Rose Foundation shall only use these Tyee funds for one or more projects
   benefitting water quality and/or aquatic habitat in Puget Sound
3) After funds are disbursed, the Rose Foundation shall send a report to the Justice
   Department, the Court and the Parties setting forth the recipient and purpose of
   the funds and demonstrating conformance with the nexus of the Consent Decree.

**Rose Foundation for Communities and the Environment**
The Rose Foundation is a 501(c)(3) public charity (tax ID#94-3179772). Its mission is to
support grassroots initiatives to inspire community action to protect the environment,
consumers and public health. To fulfill this mission, the Rose Foundation conducts the
following activities:

- Raise money to award as grants to qualified non-profit organizations conducting
  charitable operations. The Foundation does not support political lobbying activities
  prohibited by Section 501(c)(3) of the IRS Code, and no portion of the Tyee funds
  shall be used to support any political lobbying activities whatsoever.

- Work directly in schools and in the community to encourage environmental
  stewardship and civic participation.

 



- Help government efforts to control pollution and protect the environment by encouraging community engagement in local, state and federal research and policy development.

Within this broad range of activities, all of the Rose Foundation's work revolves around one or more of the following strategic themes:

- Build and maintain a bridge between the community and organized philanthropy.

- Protect the natural environment, public health, and community and consumer rights.

- Promote collaboration between labor, environmental, business, consumer and social interests.

- Cultivate a new generation of environmental stewards and social policy leaders.

- Respect the inalienable rights protected by our nation's constitution, and the essential human rights to clean air, clean water, and individual dignity and privacy.

The Rose Foundation is governed by a Board of Directors.  Grant applicants are required to submit written proposals, which must include at a minimum specific information about the goals, activities and projected outcomes of the proposed project, background about the charitable applicant, budget information, and a specific funding request. The Foundation may require additional information in order to fully evaluate the application. Applications are first screened by Foundation staff. Staff then makes recommendations to the Foundation Board for action. The Foundation requires all projects to submit written reports within one year of receipt of the grant award describing work conducted under the grant, thereby providing an accountability mechanism over funds awarded. Annual audits by the certified public accounting firm Maze and Associates are posted on the Foundation's website www.rosefdn.org.

I hope this provides you with the information you require.  Please do not hesitate to contact me with any questions, or for additional information at (510) 658-0702 or jisaacs@rosefdn.org.

Sincerely,

Jodene Isaacs
Mitigation Funds Director